Leeallan D. COBB, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 168, 1999.

Supreme Court of Delaware.

Submitted: Dec. 12, 2000.
Decided: Jan. 3, 2001.

John H. McDonald, Assistant Public Defender, Dover, for Appellant.

Timothy J. Donovan, Deputy Attorney General, Department of Justice, Wilmington, for Appellee.

Before VEASEY, C.J., WALSH and HOLLAND, JJ.

PER CURIAM:

Leeallan Cobb appeals from a Superior Court judgment entered on a jury verdict finding him guilty of one count of Unlawful Sexual Intercourse in the first degree.[1] The trial court sentenced him to a mandatory 15–year sentence at Supervision Level 5, with a suspended sentence of five additional years at Supervision Level 4. In this appeal, Cobb argues that the admission of certain bad acts evidence was reversible

error. He also argues that the limiting instruction given in connection with this evidence was inadequate. We agree with each of Cobb's contentions. Accordingly, the judgment is reversed and remanded for a new trial.

### *Facts*

The charge on which Cobb was found guilty stems from an incident alleged to have occurred in August or September 1995. At that time, Cobb was living with his wife and her three young children, including Sarah, the complaining witness, who was then 9 years old.[2] According to Sarah, the children were together in the home playing Monopoly when Cobb summoned her to the bedroom. Cobb allegedly locked the door, took off Sarah's clothes, and told her to lie down on the bed. Cobb then took off his own clothes and lay on top of her. He inserted his penis into her vagina and continued to lie on top of her for twenty-five to thirty minutes. Sarah repeatedly entreated him to stop. She tried to scream, but Cobb put his hand over her mouth. She testified that Cobb told her he would "beat me until I bled." At the end of this incident, Cobb released Sarah and told her to go play.

Sarah did not tell anyone about this incident until March 1997. In the intervening year and a half, Cobb had moved away from his wife and returned to Detroit. Meanwhile, the mother, together with her children, moved into her grandmother's house. During this period of separation the family was in contact through occasional visits and telephone calls. At some point Cobb returned to Wilmington, where he continued to see his wife and her children, but did not live with them.

On March 2, 1997, Sarah was spending the night at a friend's house in Wilmington

---

1.  11 *Del. C.* § 775.

2.  The complaining witness is the defendant's stepdaughter. The name Sarah is a pseudonym to protect the child's identity. *See* Supr. Ct. R. 7(d).

where her mother was babysitting. Cobb was also there, and when the mother left the house to run an errand, he was left alone with Sarah and several other children. According to Sarah, she and the other children fell asleep while watching television together. Cobb came and shook her, telling her to "get up." Cobb told her to go to the bathroom. As she was in the bathroom having just used the toilet, Cobb came in, shut the door, and told her to pull down her pants. Sarah managed to slip out of the bathroom. Cobb ran after her with a belt, but she ran out of the house and to her godmother's house up the street, where she reported that Cobb had tried to rape her. Cobb testified at trial that he ordered Sarah into the bathroom so that he could give her a "whooping" with his belt because Sarah had refused to turn off the television and go to bed.

Following this incident, a detective with the Wilmington Police Department interviewed Sarah. She told the detective that Cobb had raped her in the past, and made a written account of the 1995 incident explained above. After further investigation, Cobb was arrested for having had unlawful sexual intercourse with Sarah between August 1 and September 30, 1995.

### Proceedings in the Superior Court

On June 9, 1997, a grand jury indicted Leeallan Cobb for the count of Unlawful Sexual Intercourse in the first degree. On April 13, 1998, Cobb was reindicted, and a charge of Unlawful Sexual Contact in the second degree [3] was added based on the 1997 incident. A jury trial on these two charges was held from April 22 to April 28, 1998, resulting in a verdict of acquittal on the charge of Unlawful Sexual Contact in the second degree, and a hung jury on the charge of Unlawful Sexual Intercourse in the first degree.

3. 11 *Del. C.* § 768.

4. Del.Supr., 761 A.2d 6 (2000).

5. D.R.E. 404(b) provides that:

In a jury trial on February 3–5, 1999, Cobb was retried on the charge of Unlawful Sexual Intercourse in the first degree relating to the alleged 1995 incident. Before trial, defense counsel made a motion in limine to exclude any evidence of the alleged 1997 crime of which Cobb had been acquitted. The trial court denied the motion, ruling that testimony concerning the 1997 incident was admissible to explain the "delayed reporting" of the 1995 incident. The trial court ruled that the 1997 incident was "inextricably intertwined ... so as to make a congruent story for the jury to understand" with the "actual reporting that the child did at the time" and "was not introduced in any way to indicate propensity of the defendant." The "bad acts" evidence was made part of the State's case-in-chief through the testimony of Sarah herself. The trial court did not give a contemporaneous limiting instruction but included a limiting instruction in the jury charge.

The jury returned a verdict of guilty, and Cobb was sentenced on March 23, 1999. While Cobb's appeal to this Court was pending, we issued an opinion in the case of *Milligan v. State.*[4] We requested supplemental briefing on the relevance, if any, of *Milligan* to the present case.

### Evidence of Later Bad Acts

This case is factually similar to *Milligan*, which, as previously noted, was decided after Cobb's trial. In *Milligan*, the defendant was alleged to have engaged in two separate acts of unlawful sexual contact. The first occurred in Delaware and the second occurred five days later in Maryland. Accordingly, the State prosecuted Milligan only on the first charge, but sought to introduce the later uncharged Maryland incident under Delaware Rule of Evidence 404(b).[5] One of the theories of

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as

admissibility was that the Maryland incident was inextricably intertwined[6] with the late reporting of the earlier Delaware incident.

The *Milligan* court questioned why the "late reporting" evidence in that case was included in the State's case-in-chief. The Court observed that late reporting "bore no reasonable relationship to an ultimate fact to be proved in the State's case-in-chief."[7] Therefore, admission of the bad acts evidence was premature until such time as the defense actually brought up "late reporting" in rebuttal.[8]

Under this analysis, admission of the bad acts through late reporting evidence was also premature in this case. As we stated in *Milligan:*

> Any conclusion that the 'late reporting theory' was so 'inextricably intertwined' with the later bad acts that evidence of those later bad acts had to be admitted in order to meet the 'late reporting' defense related to the admissibility of rebuttal evidence and should not have been reached before the State's case-in-chief.[9]

Of course, it is not in every situation that the State must wait until rebuttal to introduce 404(b) evidence. As we have held, the State may introduce bad acts evidence

that "is material to an issue or ultimate fact in dispute in the case" as part of its case-in-chief if it demonstrates "the existence, or reasonable anticipation, of such a material issue."[10] In this case, unless the defense had actually raised late reporting, there was no material issue that would justify introducing the alleged 1997 incident of which Cobb had been acquitted.

Furthermore, even in cases where there is a late reporting defense, the relevance of the later bad act to the phenomenon of delayed reporting is tenuous. The fact that the later bad act may have triggered the complaining witnesses' report of the 1995 incident does not explain to the jury why the complaining witness waited roughly one and half years to make the report. As a logical matter the triggering incident does not allay an appearance of "superficial inconsistency"[11] associated with late reporting.

Our holding in *Wheat v. State* is that the State may use expert testimony in its case-in-chief in order to explain a complainant's late reporting of intrafamily sexual abuse.[12] *Wheat* permitted the admission of expert testimony to explain the psychology of complainants who display behavior or make statements "which, to average lay people, are superficially inconsistent with the occurrence of sexual abuse

---

proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

6. *See Pope v. State,* Del.Supr., 632 A.2d 73, 76 (1993) (holding that when exclusion of bad act evidence would "create a chronological and conceptual void in the State's presentation of its case to the jury that would likely result in significant confusion," such evidence may be admitted under the "carefully circumscribed inextricably intertwined doctrine") (citation and internal quotation omitted).

7. *Milligan,* 761 A.2d at 8.

8. *See Getz v. State,* Del.Supr., 538 A.2d 726, 731 (1988) (stating that "if an ultimate fact such as identity, intent, or plan has been placed in issue by the defendant the State may offer misconduct evidence which tends to disprove this contention").

9. *Milligan,* 761 A.2d at 9.

10. *Getz,* 538 A.2d at 734. *See, e.g., Howard v. State,* Del.Supr., 549 A.2d 692, 693–94 (1988) (upholding the admission of evidence of other crimes which the trial judge found were "necessary" to understanding the defendant's motive and formed an "integral part of the check forging plan").

11. *See Wheat v. State,* Del.Supr., 527 A.2d 269, 274 (1987).

12. *Id.* at 275 (referring to "limited use of expert testimony ... to assist ... in evaluating ... psychological dynamics;" stating that the testimony should be "given in general terms and directed to behavior factors in evidence."). *See also Wittrock v. State,* Del.Supr., No. 373, 1992, 630 A.2d 1103, 1993 WL 307616, Horsey, J. (July 27, 1993) (ORDER).

and which are established as especially attributable to intrafamily sexual abuse." [13] *Wheat* does not stand for the proposition that non-expert testimony concerning later bad acts is admissible.

### Limiting Instruction

Cobb also argues that under *Milligan* the limiting instructions included in the jury charge were reversible error. In the present case, the trial court instructed the jury as follows concerning the purpose for which the alleged 1997 incident could be considered:

> During the course of the trial, you have heard testimony regarding remarks or acts allegedly made or done by the defendant and which, if believed by you, may be regarded as improper or bad acts.
>
> In this case, [the complaining witness] alleged that the defendant came in the bathroom with her and asked that she pull down her pants. This testimony was admitted not for the truth of the matter stated but merely as evidence as to why [the complaining witness] reported the offense alleged in the indictment.[14]
>
> Occasionally, in courts of law, evidence of other acts are permitted to be introduced in the course of a trial for a variety of reasons, including motive, opportunity, intent, and/or plan to explain the context of facts that are placed before a jury.

You must not consider the alleged March 1997 incident as evidence that the defendant is a person of bad character and therefore more likely to have committed the offense charged.

■ We hold that this instruction is fatally defective for the same reasons that we identified in *Milligan*. The third paragraph of the instruction contains a generalized statement that bad acts evidence is "occasionally" admitted for "a variety of reasons." This language undercuts the very point of the limiting instruction, which is to emphasize that the evidence can be considered only for certain specific purposes.[15] The instruction goes on to say that bad acts evidence may be admitted for reasons "including motive, opportunity, intent, and/or plan to explain the context of facts that are placed before a jury." By reciting this language from DRE 404(b), the trial court risks conveying to the jury that it may consider the bad acts evidence for a number of undefined purposes, when in fact the evidence was admitted only to explain late-reporting.[16]

■ As we stated in *Milligan*, the jury should be told "the specific purpose or purposes" for which the evidence may be considered, and "that the evidence may not be considered for any other purpose." [17] Limits on the jury's consideration of bad acts evidence must be "explain[ed] in plain and direct language" and the instruction should "specify clearly the limited purpose for which the uncharged misconduct could be considered."[18] Reference to *other* pur-

---

**13.** *Wheat*, 527 A.2d at 275.

**14.** This explanation of the relevance of the 1997 incident brings into focus the lack of probative value that the incident has relative to the complainant's late reporting. "Why" the offense was reported is simply irrelevant to any issue in the case.

**15.** *See Milligan*, 761 A.2d at 10 (holding that use of the phrase "another proper purpose" was improper because "it encouraged consideration, without guidance, of any purpose contemplated by 404(b) or as the jury might presume to find proper").

**16.** *See id.* (holding that instruction was defective because it listed "a litany of possibilities that included purposes totally unrelated to [the trial judge's] careful, particularized findings purporting to justify admission").

**17.** *Id.*

**18.** *Id.* As noted in *Milligan*, an instruction that we have found sufficiently precise and emphatic in this regard is set forth in *Pope v. State*, Del.Supr., 632 A.2d 73, 78 (1993).

poses for which bad acts are sometimes considered in *other* cases is likely to be confusing and to defeat the limiting intent of the instruction. We find that the instruction given in this case "undermined the ability of the jury to accurately and intelligently return an appropriate verdict free of unfairly prejudicial effect." [19]

### Conclusion

Accordingly, the judgment of the Superior Court is reversed and remanded for a new trial.

---

**19.** *Milligan,* 761 A.2d at 11 (citing *Floray v. State,* Del.Supr., 720 A.2d 1132, 1137–38 (1998)).