IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TREVIE BURRELL, | § | |
| | § | No. 282, 2023 |
| Defendant Below, | § | |
| Appellant, | § | |
| | § | |
| | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 2107007983 |
| | § | |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted: September 4, 2024
Decided: December 2, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED.**

Herbert W. Mondros, Esquire, RIGRODSKY, P.A., Wilmington, Delaware, Karl Schwartz, Esquire, (*argued*) WISEMAN & SCHWARTZ, LLP, *for Appellant Trevie Burrell*.

Kathyrn J. Garrison, Esquire, Delaware Department of Justice, Wilmington, Delaware, *for Appellee State of Delaware*.

**LEGROW**, Justice, for the Majority:

Trevie Burrell appeals his convictions for first-degree murder, possession of a firearm during the commission of a felony ("PFDCF"), and possession of a firearm by a person prohibited ("PFBPP"). Burrell raises three issues on appeal. First, he contends that a series of prison communications were improperly admitted against him after the Superior Court found clear and convincing evidence of a conspiracy between Burrell and an inmate who contacted key witnesses shortly before trial in an attempt to convince them to not implicate Burrell. Second, he argues that the Superior Court's exclusion of information about another shooting hampered his ability to mount a defense and that redactions of that evidence from a video statement played during trial confused the jury. Third, Burrell argues for the first time on appeal that the Superior Court's pattern jury instruction defining reasonable doubt is unconstitutional because it improperly lowers the State's burden of proof to a clear and convincing evidence standard. For the reasons set forth below, we find no merit to Burrell's arguments and affirm his convictions.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On December 10, 2017, Wilmington police officers were called to a shooting on the 200 block of North Rodney Street in Wilmington.[1] There, they found Lionel Benson unresponsive and suffering from a gunshot wound to his neck.[2] Benson

---

[1] App. to Answering Br. at B5, 9, 10; App to Opening Br. at 105.

[2] App. To Answering Br. at B5–6.

survived but was rendered a paraplegic.[3]  He died eight months later as a result of treatment relating to his condition.[4]

## A.     The police investigation

Police found no eyewitnesses at the scene of the shooting, although two people had called 911 to report it.[5]  Detective Mackenzie Kirlin received information from sources who put two men at the scene: Edwin Cabrera and Andre Church.[6]  She interviewed Church two days after the shooting, on December 12, 2017, when he came into Probation and Parole for a scheduled visit.[7]  At trial, Detective Kirlin read a report of that interview in which Church stated he was with Benson when "Trev" walked up dressed in all black and shot Benson from behind.[8]  Detective Kirlin eventually identified "Trev" as the defendant, Trevie Burell.[9]

Fifteen months later, on March 12, 2019, Church and his father were arrested on unrelated gun and drug charges.[10]  Church offered to give police information on three shootings—one of which was the Benson shooting—in the hopes of receiving

---

[3] *Id.* at B20.

[4] *Id.* at B19–20.

[5] *Id.* at B5; App. to Opening Br. at A51, 62.

[6] App. to Answering Br. at B16; App. to Opening Br. at A106, 112.

[7] App. to Opening Br. at A106, 112, 114, 145–146, 148.

[8] *Id.* at A112; A150.

[9] *Id.* at A163.

[10] *Id.* at A30, 92–93, 103, 168, 182–83, 267.

leniency on the new charges.[11]  In this second interview with Detective Kirlin, Church added details to his previous statement implicating Burrell, including: how many shots Burrell fired, what Burrell was wearing, and where Burrell fled after the shooting.[12]  Church stated that he recognized Burrell's gun as one that had been taken from Church when Church was shot on a prior occasion.[13]  Church also told police that Cabrera was present at the shooting scene.[14]  Finally, Church identified Burrell in a six-photo line-up.[15]

When Detective Kirlin interviewed Cabrera two months later, Cabrera corroborated Church's statements.[16]  During this interview, Cabrera stated that he was standing outside with Church and Benson when "Trev" walked up to Benson and shot him in the head.[17]  Cabrera also identified Burrell in a six-photo line-up.[18]

## B.     The prison communications

Burrell was indicted in July 2021.[19]  A protective order entered by the Superior Court barred his counsel from disclosing the identity of trial witnesses, including

---

[11] *Id.* at A151, 168–69, 179–81.

[12] *Id.* at A309 (Church Interview at 3:00–5:00).

[13] *Id.* at A277.

[14] *Id.* at A309 (Church Interview at 3:00–5:00).

[15] *Id.* at A154–55; A269.

[16] *Id.* at A309 (Cabrera Interview).

[17] *Id.* at A290–92, 296–97, 309.

[18] *Id.* at A99–101, 300–01.

[19] *Id.* at A1.

3

Church and Cabrera.[20] The Superior Court lifted that order on March 29, 2023, five days before trial.[21] Over the course of the next two days, Dilip Nyala, an inmate housed with Burrell at James T. Vaughn Correctional Center, made three phone calls and sent a tablet message attempting to reach out to Church.[22]

In the first call, on March 30 at 8:46 p.m., Nyala called his son in order to identify people who could connect Nyala to Church "like tonight or by tomorrow."[23] Nyala disclosed, "You know, the [boy or bull] sent me a message in the back, he like yo, he go to trial on Monday."[24] Nyala later clarified that the person who sent the message was "Hurky Rock," which Burrell admitted was one of his nicknames.[25] Nyala identified Church's brother, Darius, as a potential point of contact and instructed his son to "send him a message, tell him you need Hoov's number [Church's nickname is Hoov],[26] tell him you're my son."[27] Nyala later said that he

---

[20] *Id.* at A9–10.

[21] *Id.*

[22] *Id.* at A309 (the State's audio and video exhibits were provided to this Court on flash drive, which includes audio of three intercepted prison calls).

[23] *Id.* (Nyala Call, Mar. 30, 2023 8:46 p.m. at 0:40–0:50).

[24] *Id*.

[25] Opening Br. 21 n.2; App. to Opening Br. at A309 (Nyala Call, Mar. 30, 2023 8:46 p.m. at 0:01–0:30).

[26] App. to Opening Br. at A128, 144; Opening Br. at 21 n.3.

[27] App. to Opening Br. at A309 (Nyala Call, Mar. 30, 2023 8:46 p.m. at 1:05–2:00).

was "trying to help him out, but m***f*** just sent me the message like yo tell him, I'm like I don't talk to him."[28]

Nyala then told his son, "Somebody came, was like, yo, blah blah blah, was like yo, tell 'em stand down, and I was like well I'll try to send the message out, so that's why I called you back to back to back."[29]  Nyala's son then put another unknown person on the line, and Nyala told him: "Yo, Hurky Rock sent me the message.  I need you to get with Shaq."[30]  A little later in the call, Nyala said that "I don't know what's what, but not my business, you know what I'm saying . . . I'm just trying, you know, look out for the bull, cuz that's a guaranteed elbow, ain't nobody trying to get that."[31]

Just over an hour later, Nyala sent a tablet message to Brittany Winder that read, "Hoov telling on Trev, Shaq ain't even try to talk him out of it.  He facing the long haul."[32]

Nyala made a second call to his son the following afternoon.  Church, who was at work, was brought onto the call and spoke with Nyala:

> Nyala:  Bull sent a message, I ain't, you know, I can't do too
> much, you know what I'm saying, but uh . . . .

---

[28] *Id.* at 4:45–4:55.

[29] *Id.* at 5:00–5:20.

[30] *Id*. at 6:15–6:40.

[31] *Id.* at 10:55–11:20.  An "elbow" is slang for a life sentence.  App. to Opening Br. at A231.

[32] App. to Opening Br. at A239.

Church:  Hey man . . . (laughter) they making me go because of my probation, right?

Nyala:  Yeah.

Church:  But they can't control what I say.

Nyala:  Um, OK.  All right.

Church:  All right?

Nyala:  Yeah, yeah, yeah, yeah.[33]

Nyala made his final call that evening, during which he talked for four minutes to an unidentified person.  During that call, the following exchange took place:

Nyala: You know, Hurky Rock[34] start trial Monday.

Speaker:  Well, I already know about that.

Nyala:  Yeah, I didn't know till, he had sent me a message.  And I was like, uh, I try to do what I can do for you by reaching out, but uh, you know, he was like, yo, tell, and I was like, yo, I don't talk to him.

Speaker:  Tell who?

Nyala:  Uh, you know, I don't want to say it on this phone.

Speaker:  Oh, the [Bull or boy]?

Nyala:  Yeah, yeah.  So, I was like yo, I don't talk to him, but I try and get in contact with Keen and Shaq to see what, you know,

Speaker:  They ain't messing with that [fool, boy, or bull].

---

[33] App. to Opening Br. at A309 (Nyala Call Mar. 31, 2023 3:22 p.m. at 2:10 to 2:50).

[34] This is Burrell's nickname.  Opening Br. at 21 n.2.

Nyala:  I'm just saying, you know, if they could make a difference.

Speaker: (Inaudible).  It's crazy man, (inaudible) only thing we can do is get a message.

Nyala:  Well, it just so happened, I shot the message to his brother, I got my son to hit his brother, so I was like, uh, I ended up talking to him today.

Speaker:  Uh huh.

Nyala:  And he was like, he said they making him go, he said but they can't control what he say when get there, so.

Speaker:  (Inaudible and cross talk).

Nyala:  I'm like, bull shot, you know, I told him, like yo, he shot me a message, I said man, I don't, you know.[35]

After the pair discussed the date of trial, the conversation resumed:

Nyala:  It's not just him, though.  No, it's the other [Bull] too.

Speaker: (Inaudible).

Nyala:  But they say he, that the boy like recanted his shit so, I don't know.

Speaker:  But the lawyers will wear that out.

Nyala:  No, not (inaudible), the other one, the second, you know.

Speaker:  Yeah, well, the second too, because they got a motive.

Nyala:  Naw, the second dude ain't got no motive.  He just, you know, he just said he said it because the one dude told him to.

---

[35] App. to Opening Br. at A309 (Nyala Call Mar. 31, 2023 9:06 p.m. at 0:25 to 2:05).

Speaker: But that's what I'm saying. He just coming out willy–nilly saying that.

Nyala: Well, you know, he was there, you know what I'm saying, but, you know, he's saying he only said it cuz bull told him to say it so, I don't know, it's just what it, you know.

Speaker: Well, we got to find out.

Nyala: Yeah.

Speaker: We got to find out because everything start on Monday.

Nyala: Yeah, I said what all I could say.[36]

## C. The Superior Court's pretrial rulings regarding the admissibility of the witnesses' statements

The Superior Court held a pretrial conference on March 29, 2023, to determine whether and to what extent Church or Cabrera's recorded interviews would be admissible as substantive evidence under 11 *Del. C.* § 3507 if either witness was uncooperative at trial.[37]

Among the issues that the court considered were Church's statements regarding an incident in which he was shot. Church identified who shot him and the circumstances surrounding the shooting. The Superior Court did not think that the

---

[36] *Id*. (Nyala Call Mar. 31, 2023 9:06 p.m. at 2:30 to 4:05).

[37] The State said: "I think it bears repeating that if we're under 3507 context and we're playing this statement, it's because the State laid the foundation for what I expect to be an uncooperative witness." *State v. Burrell*, Pretrial Conference Transcript at 42 (Del. Super. Mar. 29, 2023, I.D. No. 2107007983-60).

name of the person who shot Church in the past was relevant, and defense counsel

agreed:

> THE COURT: Doesn't the fact that he got shot also go to his credibility in terms of why he's doing what he's doing?
>
> [Defense counsel]: Well, I think it can cut both ways, Your Honor. I think—
>
> THE COURT: I do too. I'm going to allow it. Now, the question is— the question is, does it matter—does it matter who shot him? Do we need to get into that?
>
> [Defense counsel]: No, Your Honor.[38]

Burrell and the State collaborated on redacting the witness statements to avoid confusion and improve "flow."[39] Defense counsel foresaw possible confusion with the proposed redaction and expressed concern that the jury might think that Burrell was the person who shot Church. Defense counsel therefore confirmed with the court that any confusion could be clarified during trial:

> [Defense counsel]: My fear, though, is that they may not understand.
>
> THE COURT: Well, you can educate them in closing.
>
> [Defense counsel]: Okay. Now, am I allowed to get into on cross– examination who shot him?
>
> THE COURT: I think you can ask him do you know who shot him.
>
> [Defense counsel]: Okay.

---

[38] App. to Opening Br. at A28.

[39] *Id.* at A35.

9

THE COURT: And how do you know. And—

[Defense counsel]: Okay. So, it will come out here, but I will be able to ask the question.[40]

The parties ultimately agreed about most, if not all, of the redactions.[41] The State proposed including some of Church's description of his shooting so that the jury would not mistake Burrell as the shooter.[42] Defense counsel stated that the State's proposal assuaged his initial concerns:

> [The State]: That would flow nicely—at least a little bit better than "he shot me in my leg;" right?
>
> [Defense counsel]: I agree, because the original way that it would have read is what I was concerned with. Out of context, it almost makes it sound like he got shot, you know, by my client on this particular incident. So I think that's a good idea by [the State] to compromise
>
> [The State]: So we will redact—we will redact page 6, line 11 through page 7, line 16.
>
> THE COURT: Okay.[43]

After the parties' redactions, the trial court held that the following excerpt from Church's statement could be played for the jury if it was ruled admissible at trial under 11 *Del. C.* § 3507.

---

[40] *Id.* at A33–36.

[41] *Id.* at A33–34.

[42] *Id.*

[43] *Id.* at A35–36.

DETECTIVE KIRLIN: . . . You know I have Stink shooting.

CHURCH: I know that.

DETECTIVE KIRLIN: But I know about yours too.

CHURCH: Uh–huh.

DETECTIVE KIRLIN: So.  So, what do you know about Stink's?

CHURCH: Trev did it.

DETECTIVE KIRLIN: Trev?  So, what happened that day?

CHURCH: Same situation how I explained it to you. Right? (Inaudible) he was talking.  There was conversation.  I was looking up down the street at a car coming up.  When I turned around, we had seen Trev walk behind us and go down to the basement.  He beelined turn right back around, stood behind me, shot him in the head.

 DETECTIVE KIRLIN: When you say walked down the basement, what basement?

CHURCH: Bag's basement.

DETECTIVE KIRLIN: Oh, okay, so, the house that you guys are at?

CHURCH: That we used to be at. *** [other redaction irrelevant to this issue]

DETECTIVE KIRLIN: Huh.  Okay.  So, were they all like friends? Were they friends or just what?

CHURCH: I'm not going to say that.  Them m***f*** were cordial. I'm not going to say they was really friends or anything like that.

DETECTIVE KIRLIN: Just work together.

11

CHURCH: You know how like it ain't even work together. But you know how like some people don't like one person, so they take sides or something for someone.

DETECTIVE KIRLIN: Right.

CHURCH: And it was all surrounding what took place with me. [redacted].

DETECTIVE KIRLIN: What with the 3rd Street thing?

CHURCH: When I got shot. [redaction challenged on appeal][44]

CHURCH: He shot me in my leg, then he came down slowly on top of me and shot me.

---

[44] The exchange below was redacted from the video played to the jury. App. to Opening Br. at 260.

DETECTIVE KIRLIN: On 3rd Street, right?

CHURCH: It all surrounding that. Because I wasn't supposed to be shot that night. That shit wasn't meant for me. It was meant for Bags.

DETECTIVE KIRLIN: You and Bags are f***ing complete height difference.

CHURCH: I was standing there with him. I stuck up for him. I said something to the dude.

DETECTIVE KIRLIN: Oh.

CHURCH: The dude was standing behind the truck. I said, who the f*** is that. What you got me in? I said, Bags, n[]r got a gun. I already got information that he was mugging on Bags. I was telling him that. Them m***f*** left me out there.

DETECTIVE KIRLIN: So, Bags ran?

CHURCH: And left me out there.

DETECTIVE KIRLIN: That's dirty. . . .

CHURCH: Thomas Pain [sic], that's who shot me.

DETECTIVE KIRLIN: Thomas Pain [sic]? So, was he by himself?

CHURCH: Yeah

DETECTIVE KIRLIN: No way, that's –

CHURCH: Yes. He was by himself. Shot me with an AR-15.

DETECTIVE KIRLIN: Right. No, I remember that.

12

DETECTIVE KIRLIN: Have you ever seen him back out?

CHURCH: Never seen him again. If I did, it probably be another situation

DETECTIVE KIRLIN: Right. Huh [. . .][45]

## D. The trial

The jury was selected on March 30, 2023, and a bifurcated trial began on April 3, 2023.[46] The parties first tried an "A" case on the murder and PFDCF charges, followed immediately by a "B" case, which related to the PFBPP charge and was tried to the same jury.[47] On the third day of the "A" case, the jury found Burrell guilty of first-degree murder and PFDCF.[48] The next day, after the parties stipulated that Burrell was a person prohibited from possessing a firearm at the time of the murder, the jury found Burrell guilty of PFBPP.[49]

The evidence that the jury heard included Church and Cabrera's redacted pretrial statements. Although both Church and Cabrera testified at trial, they each retreated from their previous statements implicating Burrell.[50] Cabrera testified that

---

[45] App. to Opening Br. at A259–61; A309 (Church's interview at 2:50–3:05).

[46] *Id.* at A10.

[47] *Id.* at A10–12.

[48] *Id.* at A12.

[49] *Id.*

[50] *Id.* at A129–32, 141–42. Cabrera had to be detained on a material witness warrant in order to secure his presence at trial. *Id.* at A38, 63.

13

he did not see who shot Benson and only previously said otherwise in an effort to help Church.[51] Church, who by then had taken a plea on his unrelated charges and was now out of prison due to his testimony in another case,[52] answered many questions about the shooting with "I don't recall."[53] Videos of both Cabrera and Church's interviews with Detective Kirlin were played for the jury under 11 *Del. C.* § 3507 after the Court found the requisite statutory foundation was met.[54] Before playing the video of Church's interview with Detective Kirlin, the Court gave a redaction instruction to the jury that said:

> You are about to hear a video that's been partially redacted, which means that certain contents of the document, audio, or video have been edited out of the document, audio or video. Redactions are necessary for a wide variety of reasons, including the redacted information is unrelated the evidence of the case, that the Court has determined that the information is not admissible, or to protect personal information of individuals who are parties to this criminal action. These are just some examples of why we redact things. You may give the unredacted information in any document, audio or video whatever weight you choose to give it and you are not to consider any characterizations of the fact or existence of a redaction in any document, audio or video, including by counsel.[55]

---

[51] *Id.* at A42, 47–53, 55–56, 70.

[52] *Id.* at A186–89.

[53] *Id*. at A129–32, 140–44.

[54] Trial Tr. at 174–76 (April 3, 2023); Trial Tr. at 114 (April 4, 2023).

[55] Trial Tr. at 112 (April 4, 2023).

The State also moved to admit Nyala's prison communications after Nyala invoked his Fifth Amendment right to not testify.[56] Defense counsel objected to the Nyala communications on the grounds that the statements were hearsay and inadmissible character evidence.[57] The Superior Court held that there was clear and convincing evidence that Burrell and Nyala were involved in a plan to pressure Church to not testify, and the statements therefore fell under the co-conspirator exclusion from the definition of hearsay.[58] The Superior Court also found that the prison communications should be admitted under Rule 404(b) because they were evidence of Burrell's identity, motive, and intent.[59]

On July 28, 2023, the Superior Court sentenced Burrell as follows: (1) for first-degree murder, the balance of his natural life at Level V; (2) for PFBPP, ten years at Level V; and (3) for PFDCF, ten years at Level V, suspended after five years for decreasing levels of supervision.[60]

Burrell filed a timely notice of appeal.[61] He advances three arguments supporting his request that we reverse his convictions and remand for a new trial: (1) the Superior Court erred and abused its discretion when it admitted the Nyala

---

[56] App. to Answering Br. at B26–28.

[57] Trial Tr. 3–10 (April 5, 2023); Trial Tr. 174–78 (April 4, 2023).

[58] Trial Tr. at 14 (April 5, 2023).

[59] *Id*. at 17–18.

[60] App. to Opening Br. at A12; Ex. A to Opening Br.

[61] Opening Br. at 1; D.I. 1.

communications, which Burrell contends were inadmissible hearsay; (2) the Superior Court erred and abused its discretion when it excluded the name of Church's shooter and admitted Church's redacted statement, which hampered Burrell's defense and created a false impression that he shot Church; and (3) the Superior Court's jury instructions concerning reasonable doubt improperly lowered the State's burden of proof and therefore constituted plain error.[62]

## II.    STANDARD OF REVIEW

We review trial court rulings on the admissibility of evidence for abuse of discretion.[63]  An abuse of discretion occurs when the lower court has exceeded the bounds of reason in light of the circumstances or so ignored recognized rules of law or practice as to produce injustice.[64]  To the extent that we examine the trial judge's legal conclusions, we review them *de novo* for errors in formulating or applying legal precepts.[65] Claims of constitutional violations are reviewed *de novo*.[66]

---

[62] Opening Br. at 19, 32, 39.

[63] *McCrary v. State*, 290 A.3d 442, 454 (Del. 2023); *Brown v. State*, 117 A.3d 568, 579 (Del. 2015); *McNair v. State*, 990 A.2d 398, 401 (Del. 2010).

[64] *McNair*, 990 A.2d at 401.

[65] *Williams v. State*, 962 A.2d 210, 214 (Del. 2008).

[66] *Martini v. State*, 941 A.2d 1019, 2007 WL 4463586, at *2 (Del. 2007) (TABLE).

## III. ANALYSIS

**A. The Superior Court did not abuse its discretion or plainly err in admitting the prison communications.**

On appeal, Burrell argues that the Superior Court erred and abused its discretion when it permitted Nyala's prison communications to be presented to the jury as evidence.[67] The Superior Court relied on three evidentiary rules—Rules 801(d)(2)(E), 804(b)(6), and 404(b)—to admit the communications.[68] The State concedes that the Superior Court incorrectly applied Rule 804(b)(6).[69] The State argues, however, that the communications were correctly admitted under Rules 801(d)(2)(E) and 404(b).[70] Burrell contends that the communications were inadmissible because there was no evidence of a conspiracy or other connection between Nyala and Burrell.

---

[67] Opening Br. at 19.

[68] Trial Tr. 17–18 (April 5, 2023).

[69] D.R.E. 804(b)(6) is an exception to the hearsay rule for an unavailable witness and applies when the statement is offered against a party that wrongfully caused the *declarant's* unavailability as a witness. *See Phillips v. State*, 154 A.3d 1130, 1142 (Del. 2017) (explaining forfeiture by wrongdoing); *see also* Answering Br. at 14. Here, Nyala was the declarant, but Burrell had not caused Nyala's unavailability. *See* Answering Br. at 14. The parties agree on this point.

[70] Answering Br. at 15–21. D.R.E. 801(d)(2)(E) allows for statements of a co-conspirator to be admitted when they are made in furtherance of a conspiracy. D.R.E. 404(b) prohibits the admission of crimes, wrongs, or other acts as character evidence, but allows for their admission for another proper purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

17

**1. The trial court did not abuse its discretion in holding that the statements were not hearsay.**

Rule 801(d)(2)(E) excludes from the definition of hearsay statements that are offered against an opposing party and that were made by the opposing party's co-conspirator in furtherance of a conspiracy.[71] The rule requires that "the conspiracy has first been established by the preponderance of the evidence to the satisfaction of the court."[72] A statement qualifies under this exclusion if the proponent of the evidence can show by a preponderance of the evidence that: (1) a conspiracy existed; (2) the co-conspirator and the defendant against whom the statement is offered were members of the conspiracy; and (3) the statement was made during and to further the conspiracy.[73] The trial court may rely on the statements themselves to establish the conspiracy.[74]

**a. The Superior Court did not abuse its discretion by finding that a conspiracy existed.**

Burrell first argues that the State did not establish the existence of a conspiracy between Burrell and Nyala. Burrell relies in part on our decision in *Ayers v. State*,[75]

---

[71] *Lloyd v. State*, 534 A.2d 1262, 1264 (Del. 1987).

[72] D.R.E. 801(d)(2)(E).

[73] *Id*.; *Lloyd*, 534 A.2d at 1264.

[74] *Swan v. State*, 820 A.2d 342, 353 (Del. 2003) (citing *Lloyd,* 534 A.2d at 1264–65). "[A] court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted." *Bourjaily v. United States*, 483 U.S. 171, 181 (1987). "The Delaware Uniform Rules of Evidence are modeled after the Federal Rules of Evidence." *Manna v. State*, 945 A.2d 1149, 1154 n.14 (Del. 2008).

[75] 97 A.3d 1037, 1041 (Del. 2014).

in which we affirmed the admission of wiretap recordings under Rule 801(d)(2)(E) based on the content of the wiretap recordings, law enforcement's later surveillance of the parties, and other circumstantial evidence that a drug transaction had taken place.[76] We disagree that *Ayers* suggests that the conspiracy evidence in this case was not sufficient. In Burrell's case, the communications themselves, coupled with the circumstantial evidence regarding the lifting of the protective order and the timing of the communications, offered persuasive evidence of Burrell's involvement in a conspiracy.[77] Burrell argues that Nyala was acting without any guidance from Burrell.[78] The calls do not support that inference and certainly do not outweigh the State's showing.

The timing of the communications is not easily ignored. On March 29, the Superior Court lifted the protective order, which allowed Burrell to learn for the first time that Church and Cabrera were witnesses for the State. Nyala made his first call the following evening, and told his son that "the boy sent me a message telling me that he goes to trial on Monday."[79] Nyala then asked his son to get a message to

---

[76] *Id.* at 1040–41.

[77] *Id.*

[78] Opening Br. at 23.

[79] App. to Opening Br. at A309 (Nyala Call, Mar. 30, 2023 8:46 p.m. at 0:01–0:30).

Darius Church, Church's brother, to get Church to "stand down."[80]  Nyala said that he had just received the message ten minutes earlier.[81]

Burrell admitted that Hurky Rock was his nickname.[82]  In the first call, Nyala said: "Yo, Hurky Rock sent me the message; I need you to get with Shaq."[83]  In this call, Nyala also discussed contacting Cabrera, who was "out in Jersey."[84]  In the third call, Nyala stated, "you know, Hurky Rock start trial Monday."[85]  The unidentified speaker responded, "well, I already know about that," to which Nyala answers, "yeah, I didn't know 'till, *he had sent me a message*, and I was like, uh, I try to do what I can do for you by reaching out."[86]

Based on the timing and content of these calls, the Superior Court could reasonably conclude that Burrell and Nyala were conspiring to discourage key witnesses—Church and Cabrera—from testifying.

---

[80] "[S]omebody came, was like, yo, blah blah blah, was like yo, tell 'em 'stand down,' I was like well I'll try to send the message out, so that's why I called you back to back to back."  *Id.* at 5:00–5:20.

[81] App. to Opening Br. at A238–39.

[82] Opening Br. at 21 n.2.

[83] App. to Opening Br. at A309 (Nyala Call, Mar. 30, 2023 8:46 p.m. at 6:15–6:40).

[84] *Id.* at 10:15–10:30.

[85] *Id*. at A309 (Nyala Call Mar. 31, 2023 9:06 p.m. at 0:30 to 0:50).

[86] *Id.* at 0:45 (emphasis added).

### b. The Superior Court did not abuse its discretion by finding that the statements were made by a co-conspirator.

The same communications support the Superior Court's conclusion that the statements admitted into evidence were those of a co-conspirator. Nyala repeatedly referred to "Hurky Rock"[87] giving him a message and implied that he was acting at Burrell's instruction.[88] Burrell and Nyala were housed in the same prison facility, and Nyala had information that had only just been released to Burrell by his attorneys.[89]

### c. The Superior Court did not abuse its discretion by finding that the statements were made in furtherance of conspiracy.

Finally, Burrell argues that the communications do not show that he solicited Nyala to contact Church. Burrell disputes that "stand down" refers to an attempt to dissuade Church from testifying, and instead asserts that Nyala was only discussing a nebulous "message" and the fact that Burrell was going to trial next week, but nothing more.[90]

Burrell's narrative is a poor explanation for the evidence. The communications showed that Nyala was trying to contact Church, and in fact did so,

---

[87] "Hurky Rock" is Burrell's nickname. Opening Br. at 21 n.2.

[88] App. to Opening Br. at A309 (Nyala Call Mar. 31, 2023 9:06 p.m. at 0:45).

[89] *Id*. at A238–40.

[90] Opening Br. at 24–25.

in an effort to get Church to "stand down."[91]  When Nyala and Church spoke, they expressly discussed whether Church would testify, and during that call Church explained that although probation was making him testify, it could not control what he said.[92]  Then, at trial, Church was unresponsive to most of the State's questions.[93]  Based on that evidence, the Superior Court correctly concluded that the State satisfied its burden under Rule 801(d)(2)(E).

> **d.** **The Superior Court did not abuse its discretion in holding that the prison communications were admissible under Rule 404(b) and Getz v. State.**

Burrell separately challenged the Nyala communications as inadmissible "prior bad acts" evidence.[94]  Rule 404(b)(1) proscribes using "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."[95]  The Rule expressly states, however, that "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[96]  The Superior Court ruled that the Nyala

---

[91] App. to Opening Br. at A238–39; App. to Opening Br. at A309 (Nyala Call, Mar. 30, 2023 8:46 p.m. at 5:00–5:20).

[92] *Id.* at A239–40; App. to Opening Br. at A309 (Nyala Call Mar. 31, 2023 3:22 p.m. at 2:10 to 2:50).

[93] App. to Opening Br. at A129–42.

[94] Trial Tr. 3–8 (April 5, 2023).

[95] D.R.E. 404(b)(1).

[96] D.R.E. 404(b)(2).

communications were admissible evidence of Burrell's identity as the shooter, which is an acceptable purpose under Rule 404(b)(2).[97] The court then weighed the evidence and held that it was admissible under *Getz v. State*.[98]

In *Getz v. State*,[99] this Court established a series of factors that a trial court must consider in weighing whether to admit evidence under Rule 404(b). Burrell argues that two of those factors should have prompted the court to exclude the evidence. Burrell contends that the State did not prove witness tampering by plain, clear and conclusive evidence, and the evidence failed the probative-versus-prejudicial balancing test.[100] Burrell's arguments are unavailing for much the same reasons that support the Superior Court's findings regarding the existence of a conspiracy.

---

[97] The trial court stated that the evidence "serves to confirm Burrell's identity as the assailant and thereby providing Burrell with motive and the intent to dissuade a key witness." App. to Opening Br. at A244. The 404(b) inquiry should have been confined to whether the witness tampering constituted evidence of Burrell's identity as the assailant in the charged crime, which it did. *See generally* Thomas A. Mauet & Warren D. Wolfson, *Trial Evidence* 98–110 (6th ed. 2016); *see also United States v. Caldwell*, 760 F.3d 267, 276 (3d Cir. 2014) ("the proponent must identify a proper 404(b) purpose for admission (such as knowledge or intent) that is at issue in, or relevant to, the case."); *United States v. Sampson*, 980 F.2d 883, 888 (3d Cir. 1992) (evidence is acceptable under 404(b) when the lower court properly explains its "relevance to the material fact at issue"). Burrell's motive and intent to tamper with a witness was not relevant to the Rule 404(b) analysis, since Burrell was not charged with witness tampering.

[98] Trial Tr. 17–19 (April 5, 2023).

[99] 538 A.2d 726, 734 (Del. 1988).

[100] Opening Br. at 26–27.

Without repeating our Rule 801(d)(2)(E) analysis, we affirm the trial court's analysis under *Getz*. The evidence satisfied *Getz*'s "plain, clear and convincing" standard because Nyala's communications were not open to reasonable interpretation, and they were clear evidence of what occurred.[101] The content of those communications amounted to conclusive proof that Burrell was attempting, through Nyala, to influence Church and Cabrera's testimony.[102] The probative value of that evidence is unmistakable; a jury could reasonably infer that Burrell was the assailant based on his efforts to dissuade key witnesses from testifying against him.

For these reasons, the Superior Court did not abuse its discretion in admitting the Nyala communications.

**B.      The Superior Court did not plainly err or abuse its discretion by admitting Church's redacted interview.**

Burrell raises two arguments on appeal concerning the redactions to Church's interview with Detective Kirlin. First, he argues that by redacting the name of the man who shot Church, the video created the false impression that Burrell was Church's assailant. Second, Burrell argues that the redaction of the shooter's name hampered his ability to present a defense because it gave him less information with which to impeach Church.[103] The State argues that Burrell agreed to the redactions,

---

[101] *See supra* Section III(A)(1)(a).

[102] *See supra* Section III(A)(1)(a)–(c).

[103] App. to Opening Br. at A30.

defense counsel was able to impeach Church or clarify the shooter's identity if he felt it was necessary to do so, and the shooter's name was not material to impeaching Church.[104]

We review a trial court's decision on the admissibility of evidence under an abuse of discretion standard.[105] Generally, this Court will not review contentions that were not fairly presented to the trial court.[106] This Court may excuse a forfeiture if it finds that the trial court committed plain error such that the interests of justice require review.[107] Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process.[108]

Even if we conclude that Burrell did not waive his objection to the court's evidentiary ruling, Burrell's arguments would not support reversal of the court's holding.

---

[104] Answering Br. at 29.

[105] *Hines v. State*, 248 A.3d 92, 99 (Del. 2021).

[106] *Turner v. State*, 5 A.3d 612, 615 (Del. 2010).

[107] *Monroe v. State*, 652 A.2d 560, 563 (Del. 1995).

[108] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986) (citing Supr. Ct. Rule 8; *Dutton v. State*, 452 A.2d 127, 146 (Del. Super. 1982)).

**1.    The trial court's ruling did not violate Burrell's due process rights or constitute an abuse of discretion.**

Burrell argues that the redaction violated his due process right to "present a complete defense."[109]  The exclusion of critical evidence can lead to a due process violation.[110]  But the defense does not have an unfettered right to present any evidence it wishes.  Although the Due Process Clause "guarantees criminal defendants a meaningful opportunity to present a complete defense,"[111] "the Constitution leaves to the judges who must make [evidentiary] decisions 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'"[112] Evidentiary rulings violate the Constitution when they "infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve."[113]  The United States Supreme Court has held that:

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value

---

[109] Opening Br. at 34.

[110] *Nevada v. Jackson*, 569 U.S. 505, 509 (2013); *Holmes v. South Carolina* 547 U.S. 319, 324 (2006); *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).

[111] *Nevada*, 569 U.S. at 509.

[112] *Crane v. Kentucky*, 476 U.S. 683, 68990 (1986) (alterations in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

[113] *Holmes*, 547 U.S. at 324–25.

is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.[114]

The trial court's exclusion of the name of Church's shooter did not prevent Burrell from mounting a complete defense at trial. The name of Church's shooter was marginally relevant, or not relevant at all, which defense counsel conceded.[115] The evidence certainly was not "critical."[116] The thrust of Burrell's defense had nothing to do with who shot Church; it centered on trying to show that Church shot Benson and that, in any event, Church was not a credible witness.

Among Burrell's challenges to Church's credibility at trial was his argument to the jury that Church's statements in March 2019 were motivated by Church's desperate attempt to avoid a substantial prison sentence on his new charges, making Church's information inherently untrustworthy.[117] On appeal, Burrell argues that defense counsel wanted to impeach Church by emphasizing that Church did not even identify his own shooter until he attempted to leverage the information to reduce his own criminal charges.[118] But defense counsel was to free to make that argument without the jury knowing the shooter's name.[119] Ultimately, however, counsel chose

---

[114] *Id.* at 326.

[115] App. to Opening Br. at A28.

[116] *Chambers*, 410 U.S. at 294.

[117] App. to Answering Br. at B32.

[118] Opening Br. at 33.

[119] *Id.* at A28, A30–31.

to impeach Church with other, more relevant information, such as the fact that Benson was shot with a gun that Church previously owned, and the fact Church was only talking to Detective Kirlin in order to get out of a litany of other charges that were brought up at trial.[120]

The trial court also did not abuse its discretion in holding that the name of Church's shooter was not relevant.[121] Under Rule 401, evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[122] The Superior Court held that the shooter's name was irrelevant, which defense counsel at the time agreed was true.[123] The identity of Church's shooter—or the name Church provided Detective Kirlin—did not have any tendency to make any fact of consequence in Burrell's trial more or less probable. Whatever significance Church's shooting had during trial, the identity of the perpetrator of that shooting had no discernible relevance.

### 2. The redactions did not amount to plain error.

Burrell alternatively argues that the redactions to Church's statements about his shooter's identity constituted plain error because the redacted statement created

---

[120] App. to Answering Br. at B31–32.

[121] *See Hines*, 248 A.3d at 99.

[122] D.R.E. 401.

[123] App. to Opening Br. at A28.

the false impression that Burrell shot Church.  Burrell did not raise this argument below and in fact advised the trial court that the State's proposed redactions addressed Burrell's concern regarding the potential for juror confusion.[124]  We conclude that Burrell waived this due process argument on appeal when he agreed to the redactions at the pretrial conference.

The dissent views this as a forfeiture rather than a waiver.  As our dissenting colleague correctly points out, we indulge every reasonable presumption against finding waiver in the criminal context.[125]  On the other hand, we also view affirmative statements as a "stronger demonstration of waiver 'than mere absence of an objection.'"[126]  During the parties' discussions regarding the redactions to Church's statement, Burrell's counsel advised the court: "*I agree, because the original way that it would have read is what I was concerned with*.  Out of context, it almost makes it sound like he got shot, you know, by my client on this particular incident."[127]  And when the Superior Court asked whether the name of the person who shot Church was relevant, defense counsel responded "No."[128]  Given that record, we cannot conclude that defense counsel simply failed to assert Burrell's

---

[124] *Id*. at A33–35.

[125] *Purnell v. State*, 254 A.3d 1053, 1101 (Del. 2021).

[126] *Stevenson v. State*, 149 A.3d 505, 516 (Del. 2016) (quoting and citing *King v. State*, 239 A.2d 707, 708 (Del. 1968)).

[127] App. to Opening Br. at A36 (emphasis added).

[128] *Id*. at A28.

rights in a timely manner, which would result in a forfeiture. Rather, defense counsel affirmatively agreed with the Superior Court and the State to the exact redactions at issue here, which constitutes a waiver.

But even if Burrell had not waived appellate review on this issue, we would find no plain error in the admission of the redacted statement. To constitute plain error, the issue complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process.[129] "[T]he doctrine of plain error is limited to material defects which are apparent on the face of the record, which are basic, serious, and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[130]

In a thoughtful dissent, our colleague presents an alternative theory to Burrell's as to why the redaction constituted plain error. The dissent concludes that the redactions violated Burrell's due process right to a trial free of known perjured testimony, relying on *Napue v. Illinois*[131] and its progeny. The dissent would reverse for a new trial because (i) the State should have known that the redaction caused the testimony to be misleading, and (ii) there is a reasonable likelihood that the redaction

---

[129] *Wainwright*, 504 A.2d at 1100 (citing *Dutton*, 452 A.2d at 146).

[130] *Cruz v. State*, 990 A.2d 409, 412 (Del. 2010) (citing and quoting *Baker v. State*, 906 A.2d 139, 150 (Del.2006)).

[131] 360 U.S. 264, 269 (1959).

affected the jury.[132]  Because we find that the redaction was not misleading, we do not believe that *Napue* applies in this case.  Similarly, addressing Burrell's argument on appeal, Church's redacted statement did not "distort the fact-finding process"[133] because, when considered in its entirety, the statement did not create the (false) impression that Burrell shot Church.

To advance the misleading-the-jury argument, Burrell and the dissent focus on the portion of Church's statement in which Church said "[h]e shot me in my leg, then came down slowly on top of me and shot me."[134]  Burrell argues that because the "perpetrator in this narrative is always Mr. Burrell," the jury would likely conclude that the "he" who shot Church was the same "he" who shot Benson: *i.e.*, Burrell.

Although this statement could seem confusing when viewed in isolation, the statement is clear when it is considered in its entirety and in the context heard by the jury.  A couple of lines after the statement on which Burrell focuses, Church states

---

[132] The three-step framework that some circuits have adopted to analyze *Napue* claims requires the defendant to show that: (1) the testimony or evidence presented at trial was actually false or misleading; (2) the Government knew or should have known that it was false; and (3) the testimony was material, meaning that there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.  *See* e.g., *United States v. Helmsley*, 985 F.2d 1202, 1205–06 (2d Cir. 1993) (using this three-step inquiry).  The Third Circuit uses a four-step inquiry, which would require the defendant to show the false testimony was not corrected.  *See Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 146 (3d Cir. 2017).

[133] *Beck v. Alabama*, 447 U.S. 625, 640 (1980).

[134] Opening Br. at 36; App. to Opening Br. at A261.

31

that he never saw his shooter again.[135] This is wholly inconsistent with Burrell being Church's shooter, since Benson's shooting occurred later and the entire focus of Church's statement was that he saw Burrell shoot Benson.[136] In addition, later in the same statement, Church told Detective Kirlin that Burrell said "I should shoot you too," which also is inconsistent with Burrell having shot Church.[137] There was no other evidence that anyone other than Benson was shot in the December 10, 2017 incident, and defense counsel clarified in cross-examination that these shootings were distinct.[138]

The conclusion that the statement was not misleading is confirmed by what occurred—or more accurately did not occur—at trial. When the statement was played for the jury, neither the State, defense counsel, nor the trial court expressed any concern that the redacted testimony was misleading or required clarification. That no one who was present during the trial deemed it necessary to offer further clarification on this point strongly suggests that no genuine confusion existed. The real-time perception of the trial participants persuades us that Burrell's attempt to identify confusion from an isolated portion of the paper record is not a basis to find plain error.

---

[135] App. to Opening Br. at A261.

[136] *Id.* at A260.

[137] *Id.* at A264.

[138] *Id.* at A180.

### C. The Superior Court did not err in its reasonable doubt instruction.

Burrell argues that the Superior Court's reasonable doubt instruction was constitutionally unsound because it allowed the jury to convict him on a lesser standard than proof beyond a reasonable doubt.[139] He argues that, to correctly define the standard, the court should instruct the jury that it must be "firmly convinced" of the defendant's guilt and must further instruct the jury to acquit the defendant if they think that there is a "real possibility" that he is not guilty.[140] Burrell contends that without the "real possibility" language, the Superior Court's reasonable doubt instruction was lowered to a "clear and convincing" evidence instruction.[141]

The State argues that the pattern instruction correctly defines reasonable doubt and is constitutional. The State argues that jury instructions should be viewed as a whole and that the "firmly convinced" language used by the trial court has been upheld in other jurisdictions. The State also contends that the "real possibility" language that Burrell asserts is necessary for the instruction to be complete is the very language that we described as potentially confusing in *McNally v. State*.[142]

---

[139] Opening Br. at 40–44.

[140] *Id.* at 40.

[141] *Id.* at 40–44.

[142] 980 A.2d 364, 368 (Del. 2009), *as amended* (Sept. 28, 2009); Answering Br. at 37.

Claims of constitutional violations are reviewed *de novo*.[143] "When counsel does not object to a jury instruction at trial, the appropriate standard of review is plain error."[144] But, when a reasonable doubt instruction is constitutionally deficient, the error is structural and requires reversal of the conviction.[145]

The Superior Court pattern jury instruction on reasonable doubt reads:[146]

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. Therefore, based upon your conscientious consideration of the evidence, if you are firmly convinced that the defendant is guilty of the crime charged, you should find the defendant guilty. If, on the other hand, you think there is a reasonable doubt that the defendant is guilty, you must give the defendant the benefit of the doubt by finding the defendant not guilty.

In *Victor v. Nebraska*,[147] the United States Supreme Court confirmed the already-established principle[148] that a jury instruction cannot convey a standard that would allow a jury to convict a criminal defendant on anything less than proof beyond a reasonable doubt. But *Victor* did not mandate any particular instruction or

---

[143] *Martini*, 2007 WL 4463586, at *2.

[144] *Whittaker v. Houston*, 888 A.2d 219, 224 (Del. 2005) (citing *Bullock v. State*, 775 A.2d 1043, 1046–47 (Del. 2001)); *Mills v. State*, 732 A.2d 845, 849 (Del. 1999).

[145] *Mills*, 732 A.2d at 850 (citing *Sullivan v. Louisiana*, 508 U.S. 275, 282 (1993)).

[146] Super. Ct. Pattern Crim. Jury Instr. 2.6. At the beginning of trial, the Superior Court gave the jury the pattern instruction. B4. In its instructions after the close of the evidence, the Superior Court gave a substantially similar instruction, with minor variations that are not at issue on appeal. A249–50.

[147] 511 U.S. 1, 5, 16 (1994).

[148] *Jackson v. Virginia,* 443 U.S. 307, 320 n.14 (1979).

phrasing. Instead, the Court emphasized that the instruction, taken as a whole, must convey the concept of reasonable doubt to the jury.[149]

In her concurrence in *Victor*, Justice Ginsburg favorably discussed a specific pattern instruction endorsed by the Federal Judicial Center:

> If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.[150]

Justice Ginsburg reasoned that the "firmly convinced" language is "further enhanced" by the juxtaposition with the "real possibility" language.[151] But she also noted:

> [T]he test we properly apply in evaluating the constitutionality of a reasonable doubt instruction is not whether we find it exemplary; instead, we inquire only whether there is a [']reasonable likelihood that the jury understood the instructio[n] to allow conviction based on proof insufficient to meet['] the reasonable doubt standard.[152]

In *Mills v. State*,[153] we reviewed an earlier version of the Superior Court's pattern reasonable doubt instruction and found that it was consistent with *Victor v. Nebraska* because the language that the Superior Court used was nearly identical to

[149] *Holland v. United States,* 348 U.S. 121, 140 (1954); *Victor v. Nebraska*, 511 U.S. 1, 5 (1994).

[150] Federal Judicial Center, *Pattern Criminal Jury Instructions* 17–18 (1987) (Instruction 21).

[151] *Victor,* 511 U.S. 1, 27 (J. Ginsburg, concurring).

[152] *Id.*

[153] 732 A.2d at 845.

the Federal Judicial Center language. That pattern instruction stated: "If, on the other hand, you think there's a reasonable possibility, or in other words, a reasonable doubt that the defendant is not guilty, you must give the defendant the benefit of that doubt by finding the defendant not guilty."[154]

In *McNally v. State*,[155] we again upheld the instruction from *Mills*, but we suggested that the phrase: "[if] you think there is a real possibility or, in other words, a reasonable doubt that the defendant is not guilty" should be changed to ". . . if you have a reasonable doubt about the defendant's guilt . . .", thereby omitting the real possibility language.[156] The Superior Court changed the instruction as we suggested in *McNally*, and that is in substance the instruction that Burrell's jury received.

A logician might understandably criticize an instruction that defines the "reasonable doubt" standard by using the phrase "reasonable doubt."[157] But the Constitution does not require grammatical or linguistic correctness.[158] Burrell's contention that we should revisit our long-standing precedent in *Mills* and *McNally*

---

[154] *Id.* at 852.

[155] 980 A.2d at 364.

[156] *Id.* at 368.

[157] Super. Ct. Pattern Crim. Jury Instr. 2.6.

[158] *Holland*, 348 U.S. at 140. The Constitution does not require that "reasonable doubt" be defined at all. *Victor*, 511 U.S. at 1. Some jurisdictions opt not to define the phrase, finding instead that reasonable doubt is "self-defining." *Id.* at 5; *but see generally* Lawrence T. White & Michael D. Cicchini, *Is Reasonable Doubt Self–Defining?*, 64 Vill. L. Rev. 1 (2019) (providing overview on studies of reasonable doubt instructions, advocating that it is better to define it). In Delaware, we have long followed the more common approach of defining the term in the instructions to the jury. *Mills*, 732 A.2d 845, 851.

36

rests largely on this hyper-technical linguistic position, without acknowledging that the Constitution does not require any particular language, but simply requires that a court instruct the jury that the State must prove the defendant's guilt beyond a reasonable doubt.[159] In addition, the court's instruction must not lead the jury to convict on a lesser standard.[160] Although Burrell argues that the instruction fails under the second principle, we cannot discern how. The instruction accurately defines the State's burden and further explains that the jury must acquit Burrell if the State fails to meet that burden.

Burrell's insistence that Justice Ginsburg's concurrence in *Victor* serves as a basis to reverse places undue emphasis on the "real possibility" language mentioned in that case. In her concurrence, Justice Ginsburg explained that the jury's understanding of the reasonable doubt standard would be enhanced if the "firmly convinced" language was juxtaposed with a reminder that the jury must acquit the defendant if the State did not carry its burden. We do not understand Justice Ginsburg's analysis as suggesting that the phrase "real possibility" was the only way to achieve that end. In any event, the Superior Court's pattern instruction creates this juxtaposition with language that we held in *McNally* would be less confusing

---

[159] *Victor*, 511 U.S. 1, 5.

[160] *Mills*, 732 A.2d 845, 852.

than the language Burrell urges us to adopt.[161]  The Superior Court's instruction therefore correctly explained the burden of proof.

## IV.  CONCLUSION

For the foregoing reasons, we affirm the Superior Court's holdings and Burrell's convictions.

---

[161] *McNally*, 980 A.2d at 368; *see also State v. Jackson*, 925 A.2d 1060, 1068 (Conn. 2007) (nearly identical instruction that said reasonable doubt instead of real possibility made it "abundantly clear" that it was not a clear and convincing standard).

**VALIHURA**, J. dissenting:

## I. Summary of My Conclusions

In April 2023, Trevie Burrell was convicted of Murder First Degree. As jury deliberations are secret and juries are not asked to give a reason for their conviction, we will never know what tipped the balance in favor of conviction. Perhaps it was testimony from Edwin Cabrera, perhaps it was testimony from Andre Church, or perhaps it was because jurors believed that Trevie Burrell shot Andre Church.

But we do know one thing about this case: Burrell did not shoot Church. Church named Thomas Payne as his shooter and the State does not dispute this fact. However, the jury did not see the full interview where Church named Payne; rather, they saw a redacted version where Payne's name was replaced by the pronoun "he" and Burrell was the last individual mentioned. The implication is clear — Burrell shot Church.

The Majority rests its holding on the view that Burrell waived appellate review of this issue; or, alternatively, that the jury could not have been left with the impression that Burrell shot Church. I disagree on both points.

I begin by explaining that forfeiture – not waiver – is the applicable standard in this case and, therefore, Burrell's argument may be reviewed under plain error. This is consistent with the State's argument for plain error review, which it made in briefing and oral argument, thereby conceding the point. Further, reviewing for plain error aligns with waiver's intentionality requirement and Trial Counsel's apparently mistaken perception of the redacted interview.

Applying plain error review leads me to consider the redacted interview and its

prejudicial impact on Burrell's defense. I explain that the most logical interpretation of the redacted interview is that "he" corresponds to Burrell because Burrell was the last individual mentioned. Here, even the State recognizes that finding Burrell shot Church is an "equally reasonable interpretation" of the interview. The remainder of the interview, cross-examination, and closing argument fail to clear up this false implication. None of these portions of the record directly contradict the false implication that Burrell shot Church and some even support it. Further, the impact of the cross-examination and the closing argument were weakened by Church's damaged credibility and the limits of closing advocacy, respectively.

I explain that the result was a highly prejudicial false implication that dealt a devasting blow to Burrell's defense. Burrell was on trial for shooting a person with a gun and the false implication was that Burrell had shot another person with a gun. This juxtaposition fostered a propensity inference of the most damaging sort and invited the jury to see Burrell as once a shooter, always a shooter.

As I explain below, the State's evidence made this a close case as it centered on two highly flawed purported eyewitnesses – Church and Cabrera. Church was heavily incentivized by the State to name Burrell as Benson's shooter and admitted as much on the stand. Cabrera recanted his allegation, claimed Church put him up to it, and further testified that he was high and focused elsewhere at the time of the shooting. With this state of evidence, there is a reasonable likelihood that the false implication that Burrell shot Church could have affected the jury's verdict. Accordingly, I would reverse and remand for a new trial.

2

## II.  Andre Church Escapes His Predicament

Andre Church understood the magnitude of what he faced when he was interviewed by Detective Mackenzie Kirlin in March 2019.[1]  Having been arrested on gun and drug charges, he was "basically facing the rest of [his] life in prison" – a fact he later admitted at trial.[2]  Church's interview is full of concern for his future and that of his family.[3]  He readily admitted this concern to Detective Kirlin and noted early on that this was "high stake shit."[4]  During the interview, Church appears visually distraught and when Detective Kirlin leaves the room, Church can be heard talking to himself, apparently anxious about the gravity of his situation.[5]

But Church had one card to play:  talk.  Talk about events that could get him a deal.  And, more specifically, talk about shootings he allegedly witnessed.  Church recognized the value of talking early and told Detective Kirlin that he was looking for a way to help his dad and him.[6]  As Detective Kirlin acknowledged at trial, Church's "main focus" was what the police could do for him.[7]

Detective Kirlin kept Church talking and the topic shifted to Benson's shooting and

---

[1] App. to Opening Br. at A266 (Church Interview at 12:17–21) (Church: "I understand the magnitude … of what is going on with me.").

[2] *Id.* at A187–89 (Church Trial Test. 146:17–147:1, 147:18–148:1).

[3] *See* Court Ex. 3 (Church Interview Video).

[4] App. to Opening Br. at A257 (Church Interview at 3:20–21).

[5] Court Ex. 3 (Church Interview Video 10:04–15:24).

[6] App. to Opening Br. at A256 (Church Interview at 2:12–14).

[7] *Id.* at A173 (Kirlin Trial Test. at 132:19–21).

a previous incident where Church was shot.[8]  Church implicated Burrell as Benson's shooter[9] and Thomas Payne as the person who shot Church in the previous incident.[10]

Church's fortunes soon remarkably improved.  As a result of what he told the police, he saw a judge, made bail, went home, and received a twelve year prison sentence in his twenty-eight count case pursuant to a plea agreement.[11]  Then, due to his testimony in another shooting case, the State filed a substantial assistance motion and his sentence was reduced to time served.[12]  Church only served from April of 2019 until November of 2022, — far less than the effective life in prison he later admitted he was facing.[13]

### III.  The State Redacts Andre Church's Interview

The State sought to redact information about Church's shooting including the motive for the shooting and the alleged shooter's name – Thomas Payne.  The State argued that this information was irrelevant and introduced individuals not involved in the case.[14] Trial Counsel argued that the point that Thomas Payne shot Church was relevant because it went to Church's credibility for impeachment purposes and why Church delayed relaying information to police.[15]  Additionally, in the interview, Church stated that the gun in this

---

[8] *Id.* at A258 (Church Interview at 4:9–16).

[9] *Id.* at A258 (Church Interview at 4:15–17).

[10] *Id.* at A261 (Church Interview at 7:7–8).

[11] *Id.* at A133 (Church Trial Test. at 92:3–9, 92:13–93:12).

[12] *Id*. at A187 (Church Trial Test. 146:5–16).

[13] *Id*. at A187–89 (Church Trial Test. 146:17–147:1, 147:18–148:1).

[14] *Id*. at A23 (Mar. 29, 2023 Pre-Trial Conference Transcript [hereinafter "Pre-Trial Conf. Trans."] at 22:11–23).

[15] *Id*. at A25 (Pre-Trial Conf. Trans. at 24:11–22).

case was the gun taken from him when he was shot.[16]

The Court orally ruled that the name of Church's shooter would be redacted.[17] The State informed the court that it would discuss with Trial Counsel exactly how to redact the interview.[18] The parties ultimately agreed to redact page six, line eleven through page seven, line sixteen.

With this information redacted, the redacted interview now read as the following (with "Trev" meaning Burrell):

**Det. Kirlin:** So. So, what do you know about Stink's [shooting]?

**Church:** Trev did it.

**Det. Kirlin:** Trev? So, what happened that day?

**Church:** Same situation how I explained it to you. Right? (Inaudible) he was talking. There was conversation. I was looking up down the street at a car coming up. When I turned around, we had seen Trev go behind us and go down to the basement. He beelined, turn right back around, stood behind me, shot him in the head.

**Det. Kirlin:** When you say walked down the basement, what basement?

**Church:** Bag's basement.

**Det. Kirlin:** Oh, okay. So, the house that you guys are at?

**Church:** That we used to be at.

[The next portion of the interview is redacted; the video, however, is spliced and continues as if uninterrupted]

---

[16] *Id*. at A26 (Pre-Trial Conf. Trans. at 25:1–6).

[17] *Id*. at A32 (Pre-Trial Conf. Trans. at 31:3–7).

[18] *Id*. at A34–35 (Pre-Trial Conf. Trans. at 33:22–34:15).

**Det. Kirlin:** Huh.  Okay.  So, were they all like friends?  Were they friends or just what?

**Church:** I'm not going to say that.  Them motherf***ers[19] were cordial.  I'm not going to say they was really friends or anything like that.

**Det. Kirlin:** Just work together.

**Church:** You know how like it ain't even work together.  But you know how like some people don't like one person, so they take sides or something for someone.

**Det. Kirlin:** Right.

**Church:** And it was all surrounding what took place with me.

**Det. Kirlin:** What with the 3 Street thing?

**Church:** When I got shot.

[The next section, in which Church implicates Thomas Payne as the person who shot him, is redacted.  The video, however, is spliced and continues as if uninterrupted.][20]

---

[19] This edit was ours.  The word appears in the manuscript and interview unedited.

[20] The ten lines immediately preceding Church's statement "He shot me in my leg" were the following:

> Church:  Thomas Pain [sic], that's who
> shot me.
> Det. Kirlin:  Thomas Pain [sic]? So, was
> he by himself?
> Church:  Yeah.
> Det. Kirlin:  No way, that's - -
> Church:  Yes. He was by himself.
> Shot me with an AR-15.
> Det. Kirlin:  Right. No, I
> remember that.

*Id.* at A261 (Church Interview 7:7–16).  These lines were redacted.

6

**Church:** He shot me in my leg, then he came down slowly on top of me and shot me.[21]

The redacted interview was played for the jury at trial.[22] The trial court informed the jury that the interview was redacted but the court did not give a propensity limiting instruction.[23] And at the trial's conclusion, the jury returned a verdict convicting Burrell on all charges.[24]

### IV. The Law Construing Admission of False and Misleading Evidence

Courts have long held that criminal defendants may not be convicted based on materially false evidence offered by the prosecutor or the court.[25] The United States Supreme Court has applied this principle in certain cases where the prosecutor uses false

---

[21] *Id.* at A258–61 (Church Interview at 4:15–7:18).

[22] *Id.* at A154 (Trial Trans. at 113:2–8); *see also id.* at A309 (State's Audio and Video Exhibits). The State's audio and video exhibits were provided to this Court on a flash drive.

[23] *Id.* at A153 (Trial Trans. at 112:5–22).

> The court: You are about to hear a video that's been partially redacted, which means that certain contents of the document, audio, video have been edited out of the document, audio or video. Redactions are necessary for a wide variety of reasons, including that the redacted information is unrelated to the evidence in this case, that the Court has determined that the information is not admissible, or to protect personal information of individuals who are parties to this criminal action. These are just some examples of why we redact things.

> You may give the unredacted information in any document, audio or video, whatever weight you choose to give it and you are not to consider any characterizations of the fact or existence of a redaction in any document, audio or video, including by counsel.

[24] *Id.* at A12 (Superior Court Criminal Docket).

[25] *See Townsend v. Burke*, 334 U.S. 736, 740–41 (1948) ("Consequently, on this record we conclude that, while disadvantaged by lack of counsel, this prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue. Such a result, whether caused by carelessness or design, is inconsistent with due process of law, and such a conviction cannot stand."); *see also Quercia v. United States*, 289 U.S. 466, 470 (1933) (stating that court may not "distort" or "add" to the evidence).

evidence to obtain a conviction.[26]

The majority of state and federal courts have applied a version of the following three-part test in false evidence cases.[27] "To establish a *Napue* violation, [the defendant] must show: (1) that the testimony or evidence presented at trial was 'actually false' or misleading; (2) that the Government knew or should have known that it was false; and (3) that the testimony was material, meaning that there is any 'reasonable likelihood that the false testimony *could* have affected the judgment of the jury.'"[28] The Third Circuit has applied a four-part test that includes the additional part that the false evidence was not corrected.[29] However, the test is not substantively different from the majority three-part test because whether the evidence was corrected would go to the element of materiality which is already considered as the third part of the three-part test.[30]

---

[26] *See, e.g.*, *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

[27] *See, e.g.*, *United States v. Helmsley*, 985 F.2d 1202, 1205–06 (2d Cir. 1993) ("It is common ground that to challenge a conviction because of a prosecutor's knowing use of false testimony, a defendant must establish that (1) there was false testimony, (2) the Government knew or should have known that the testimony was false, and (3) there was 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'") (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

[28] *United States v. Alahmedalabdaloklah*, 94 F.4th 782, 830 (9th Cir. 2024) (quoting *United States v. Renzi*, 769 F.3d 731, 751 (9th Cir. 2014)) (emphasis in original).

[29] *See, e.g.*, *Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 146 (3d Cir. 2017) (applying four-part test).

[30] The Third Circuit generally – but not exclusively – lists perjury, rather than falsity, as one of the elements of the test. *Compare*, *Haskell*, 866 F.3d at 146 (defendant must show that "[the witness] committed perjury"), *with*, *Young v. Grace*, 525 F. App'x 153, 160 (3d Cir. 2013) ("Establishing this claim requires proving (1) the testimony was false, …"). However, the Third Circuit has also written that perjury is not necessary and the Government has the obligation to correct a witness testifying untruthfully, but in good faith, when it should be obvious to the Government.

> We do not believe, however, that the prosecution's duty to disclose false testimony by one of its witnesses is to be narrowly and technically limited to those situations

"[T]he [United States] Supreme Court has held that the *Giglio*/*Napue* 'materiality' standard discussed above is equivalent to the harmless-error standard articulated in *Chapman v. California*[.]"[31] In *United States v. Bagley*, the United States Supreme Court explained that *Napue* pre-dated *Chapman v. California*, where the "harmless beyond a reasonable doubt" standard was developed and observed that "the standard of review applicable to the knowing use of perjured testimony is equivalent to the *Chapman* harmless-error standard."[32] Accordingly, a defendant may prevail in a false testimony case "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."[33]

---

where the prosecutor knows that the witness is guilty of the crime of perjury. Regardless of the lack of intent to lie on the part of the witness, Giglio and Napue require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. This is not to say that the prosecutor must play the role of defense counsel, and ferret out ambiguities in his witness' responses on cross-examination. However, when it should be obvious to the Government that the witness' answer, although made in good faith, is untrue, the Government's obligation to correct that statement is as compelling as it is in a situation where the Government knows that the witness is intentionally committing perjury.

*United States v. Harris*, 498 F.2d 1164, 1169 (3d Cir. 1974). Even in cases where the Third Circuit lists the perjury element, it has occasionally approvingly quoted the language of *Harris* which disavows the necessity of perjury. *See United States v. Stadtmauer*, 620 F.3d 238, 268 (3d Cir. 2010). Even if the Third Circuit requires perjury, this Court has not required that the false testimony be perjurious. *See Romeo v. State*, 21 A.3d 597, 2011 WL 1877845, at *3 (Del. May 13, 2011) (TABLE) (considering due process potentially violated with false *or* perjured testimony) (emphasis added).

[31] *Haskell*, 866 F.3d at 147 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)); *see also Rega v. Penn. Dep't of Corrs.*, 115 F.4th 235, 244 (3d Cir. 2024) (quoting *Haskell*, 866 F.3d at 147).

[32] 473 U.S. 667, 679, n.9 (plurality op.).

[33] *See id.*; *Romeo*, 2011 WL 1877845, at *3 (quoting *Agurs*, 427 U.S. at 106); *see also* Wayne R. LaFave et al., *Criminal Procedure*, 6 Crim. Proc. § 24.3(d) (4th ed. 2023) (false testimony claim sufficient if "there is 'any reasonable likelihood that the false testimony *could* have affected the

This Court has not clearly stated whether a conviction violates due process only when the government knows that the evidence is false or whether it also includes cases where the government should have known the evidence was false.[34] Nonetheless, a majority of circuit courts, including the Third Circuit, support the principle that the "should have known" standard is correct.[35] Further, the "should have known" standard is consistent

jury's verdict.'") (quoting *Bagley*, 473 U.S. at 679 n.9 (1985) (plurality op.)) (emphasis added by LaFave et al.).

[34] *Compare Romeo*, 2011 WL 1877845, at *3 ("We have explained that the State's knowing use of false or perjured testimony violates due process.") (citation omitted), *with Stokes v. State*, 402 A.2d 376, 379 (Del. 1979) (quoting *Agurs*, 427 U.S. at 103) ("In the first category, wherein the prosecution knowingly used perjured testimony (or should have known that the evidence was perjured), the Court ruled that the evidence would be deemed material 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"). This Court required "actual knowledge" in *O'Neal v. State*, 247 A.2d 207, 210 (Del. 1968), but *O'Neal* predated *Agurs* which has been used to support the "should have known" element. *See Stokes*, 402 A.2d at 379 (quoting "should have known" language of *Agurs*); *Commonwealth v. Rivera*, 108 A.3d 779, 802 (Pa. 2014) (stating *Agurs* as "holding that where the prosecution elicits false testimony that it knew or should have known was false, the defendant's conviction must be reversed if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.").

[35] *United States v. Ruzicka*, 988 F.3d 997, 1004 (8th Cir. 2021) ("Under *Napue*, the 'failure of the prosecutor to correct the testimony of [a] witness which he knew to be false,' or 'should have known' to be false constitutes a denial of a defendant's constitutional right to due process[.]'") (internal citations omitted); *United States v. Ausby*, 916 F.3d 1089, 1092 (D.C. Cir. 2019) (quoting *United States v. Straker*, 800 F.3d 570, 602 (D.C. Cir. 2015) (per curiam)) ("The government commits a *Napue* violation 'when the government introduces false or misleading testimony or allows it to go uncorrected, even though the government knew or should have known that the testimony was false.'"); *Haskell*, 866 F.3d at 146 ("Accordingly, in order to establish his claim, Haskell must show that (1) [the witness] committed perjury, (2) the Commonwealth knew or should have known that the testimony was false, (3) the false testimony was not corrected, and (4) there is a reasonable likelihood that the perjured testimony could have affected the judgment of the jury."); *United States v. Freeman*, 650 F.3d 673, 678 (7th Cir. 2011) ("To obtain a new trial, the defendant must establish: (1) that there was false testimony; (2) that the government knew or should have known it was false; and (3) that there is a likelihood that the false testimony affected the judgment of the jury."); *Smith v. Secretary, Dep't of Corr.*, 572 F.3d 1327, 1333 (11th Cir. 2009) ("The first category of violations, often called (and what we will call) *Giglio* claims, occurs where the undisclosed evidence reveals that the prosecution knowingly made false statements or introduced or allowed trial testimony that it knew or should have known was false.") (citing *Agurs*, 427 U.S. at 103–04); *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (quoting *United States v.*

with the language echoing duty and breach that the United States Supreme Court used in *Giglio v. United States*.[36]

In alignment with the three-part language above, courts have applied the test to evidence in general and not only to the narrower "testimony" category.[37]  Further, the test may be satisfied when the evidence is merely misleading and it does not require that

*Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)) ("'[t]o prevail on a claim based on *Mooney-Napue*, the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) ... the false testimony was material.'"); *United States v. Helmsley*, 985 F.2d 1202, 1205–06 (2d Cir. 1993) ("It is common ground that to challenge a conviction because of a prosecutor's knowing use of false testimony, a defendant must establish that (1) there was false testimony, (2) the Government knew or should have known that the testimony was false, and (3) there was 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'") (quoting *Agurs*, 427 U.S. at 103); *United States v. Gentry*, 2011 WL 13172167, at *4 (D.S.C. Mar. 10, 2011) (quoting *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994)) ("The government is considered to have knowingly used false testimony when it 'solicit[s] testimony it knew or should have known to be false' or when it 'simply allow[s] such testimony to pass uncorrected.'"); *Commonwealth v. Rivera*, 108 A.3d 779, 802 (Pa. 2014) (stating *Agurs* as "holding that where the prosecution elicits false testimony that it knew or should have known was false, the defendant's conviction must be reversed if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."); *Adams v. Comm'r of Corr.*, 71 A.3d 512, 520 n. 16 (Conn. 2013) (citing *Agurs*, 427 U.S. at 103); Wayne R. LaFave et al., *Criminal Procedure*, 6 Crim. Proc. § 24.3(d) (4th ed.) ("These rulings, including *Napue v. Illinois*, and *Giglio v. United States*, have established that the defendant's due process rights are violated whenever the prosecution's case includes false evidence which is material to the outcome, and which the prosecution either knew or should have known was false.").

[36] 405 U.S. 150, 155 (1972); *see also* Anne Bowen Poulin, *Convictions Based on Lies: Defining Due Process Protection*, 116 Penn St. L.R. 331, 355 (2011) ("This aspect of Giglio signals that a court should determine whether the prosecutor who allows false testimony to stand should have taken steps to learn the information that demonstrated the falsity of the testimony.").

[37] *See Napue*, 360 U.S. at 269 ("it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."); *United States v. Alahmedalabdaloklah*, 94 F.4th 782, 830 (9th Cir. 2024) (discussing "testimony or evidence"); *Duggan v. State*, 778 S.W.2d 465, 468 (Tex. Crim. App. 1989) (applying test to "evidence"); Wayne R. LaFave et al., *Criminal Procedure*, 6 Crim. Proc. § 24.3(d) (4th ed. 2023) (discussing the issue as "[t]he duty to correct false evidence").

evidence be factually inaccurate.[38]

## V. Burrell Did Not Waive His Argument For Purposes of Appeal and This Court May Properly Consider It Under Plain Error Review

The Majority applies the law of waiver to hold that this Court may not consider Burrell's argument on appeal. I disagree because the Majority applies the law of waiver when the law of forfeiture is the correct standard. After applying the law of forfeiture, I believe that this Court may properly consider Burrell's argument under plain error review.

The difference between waiver and forfeiture is crucial. "'Waiver is the voluntary and intentional relinquishment of a known right.'"[39] "By contrast, forfeiture is the failure to make the timely assertion of a right. The distinction between waiver and forfeiture is

---

[38] *Alahmedalabdaloklah*, 94 F.4th at 830 (noting defendant must establish "that the testimony or evidence presented at trial was 'actually false' or misleading"); *Burr v. Jackson*, 19 F.4th 395, 410 (4th Cir. 2021) ("False testimony includes both perjury and evidence that, 'though not itself factually inaccurate, ... creates a false impression of facts which are known not to be true.'") (quoting *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967)); *Ausby*, 916 F.3d at 1092 ("The government commits a *Napue* violation "when the government introduces false or misleading testimony or allows it to go uncorrected, even though the government knew or should have known that the testimony was false.") (quoting *Straker*, 800 F.3d at 603); *Freeman*, 650 F.3d at 680 ("This includes 'half-truths' and vague statements that could be true in a limited, literal sense but give a false impression to the jury."); *Gentry*, 2011 WL 13172167, at *4 (quoting *Hamric*, 386 F.2d at 394) ("False testimony violative of due process includes not only testimony that is factually inaccurate, but also testimony that 'creates a false impression of facts which are known not to be true.'"); *Duggan*, 778 S.W.2d at 468 ("It does not matter whether the prosecutor actually knows that the evidence is false; it is enough that he or she should have recognized the misleading nature of the evidence.").

[39] *Purnell v. State*, 254 A.3d 1053, 1101 (Del. 2021) (quoting *Daskin v. Knowles*, 193 A.3d 717, 725 (Del. 2018)); *see also Bultron v. State*, 897 A.2d 758, 763 (Del. 2006) (quoting *United States v. Goldberg*, 67 F.3d 1092, 1100 (3d Cir. 1995)) ("Waiver is a knowing and intentional relinquishment of a known right, whereas forfeiture 'results in the loss of a right regardless of the defendant's knowledge thereof and irrespective of whether the defendant intended to relinquish the right.'").

most visible in so-called 'plain error' analysis, where a forfeited allegation that a defendant's rights were violated can nevertheless be the basis for later reversal but a waived right cannot."[40]

Therefore, whether this Court may properly consider Burrell's argument turns on whether waiver or forfeiture applies. For the reasons below, I believe that forfeiture is the correct standard and, therefore, this Court may properly consider Burrell's argument under plain error review.

I begin by noting that the State argued in briefing[41] and during oral argument[42] that this Court should review Burrell's argument under plain error. For example, in the "Standard and Scope of Review" section of its answering brief addressing the redaction issues, the State clearly set forth its "plain error" position. The entirety of that section reads:

> This Court reviews the Superior Court's ruling on the admissibility of evidence for an abuse of discretion. Claims of constitutional violations are reviewed *de novo*. When a party did not object at trial to the admissibility of evidence, this Court reviews the issue for plain error. Under that standard, "the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process. "[T]he doctrine of plain error is limited to material defects which are apparent on the face of the record, which are basic, serious, and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show

---

[40] *Purnell*, 254 A.3d at 1101 (internal quotations omitted).

[41] Answering Br. at 3; Answering Br. at 32.

[42] Oral Argument (32:43–33:06)

> State: I would like to address the harmless error issue. It's the State's position, of course, that it should be reviewed, at least with respect to the confusion issue, under plain error review because Trial Counsel agreed that what the State suggested clarified any confusion.

manifest injustice.""[43]

The State never argued waiver in its brief on appeal.

Nor did the State argue waiver during oral argument before this Court. Burrell's counsel's oral argument was focused almost exclusively on the merits of the redaction issue. The State responded to the redaction arguments on the merits and agreed several times that the applicable standard of review was plain error. Given that both the State and Burrell agree that this Court may consider Burrell's argument under plain error, that should end the matter.

Waiver is not the correct standard for this case for other reasons. Courts do not easily find waiver and "[i]n the criminal context, it is 'incumbent upon the State to prove' waiver, and 'the courts indulge in every reasonable presumption against waiver.'"[44] Although the Majority acknowledges that we should indulge every reasonable presumption against finding waiver in a criminal context, it does not actually engage in such indulgence. It bases its decision on waiver on the following statements made by Burrell's counsel:

> [Trial Counsel]: I agree, because the original way that it would have read is what I was concerned with. Out of context, it almost makes it sound like he got shot, you know, by my client on this particular incident. So I thought that's a good idea by [State's counsel] to compromise.[45]

However, this statement by Burrell's trial counsel followed the Superior Court's overruling trial counsel's objection to redacting the name of Church's shooter. It also

---

[43] Answering Br. at 22-23 (citations and internal quotation omitted).

[44] *Purnell*, 254 A.3d at 1101 (quoting *Flamer v. State*, 490 A.2d 104, 113 (Del. 1983)).

[45] A 36.

14

followed trial counsel making clear that he was maintaining his objection, notwithstanding any subsequent agreement or compromise with the State. For example, the State went through the redaction to see whether "we are okay with everything on the rest of page 6 being out," and then asked "beginning on page 7, would that redaction then run down to line 16, per the Court's order?"[46] Burrell's trial counsel responded, "That's correct, per the Court's order over my objection on the part we discussed."[47]

Burrell argues that his trial counsel was obligated to mitigate the impact of the adverse ruling on the redaction of the shooter's name and that his subsequent comprise did not "undo his objection."[48] He argues that a finding to the contrary "creates a waiver trap." On these facts, I agree. It is apparent to me that no counsel recognized that there could be potential confusion arising from the agreed-upon redaction. In fact, the State acknowledged this at oral argument: "No one seemed to recognize there would be any potential confusion and in fact defense counsel and State agreed[.]"[49]

Given the state of the record on Burrell's trial counsel's "agreement," his attempt to preserve his objections, and given that no party, either in briefing or oral argument, has argued that these facts and circumstances resulted in a waiver precluding review by our Court (which listened to the entirety of the argument on the merits without any suggestion made that we should not consider the argument), it is clear that finding waiver is

---

[46] A 34.

[47] *Id.*

[48] Opening Br. at 11.

[49] Oral Argument Video at 29:54.

inconsistent with our requirement that we indulge every reasonable presumption against waiver.

Further, I struggle to see how Trial Counsel's statements constituted the "voluntary and intentional relinquishment of a known right[]" necessary for waiver.[50] It is apparent that Trial Counsel did not grasp the false implication from the redacted interview. This may not have been Trial Counsel's finest hour, but it took place during a time-constrained situation. And the record indicates that Trial Counsel was unaware of the false implication, mistakenly believing that the any issues had been resolved.[51] Thus, I believe that Trial Counsel's mistaken view of the false implication cannot square with waiver's intentionality requirement.[52] Absent the intentionality of waiver, the applicable standard is forfeiture.[53] "[F]orfeiture is the failure to make the timely assertion of a right[]"[54] and leads to plain error review.

---

[50] *Id.* (quoting *Daskin*, 193 A.3d at 725); *see also Bultron*, 897 A.2d at 763 (quoting *Goldberg*, 67 F.3d at 1100) ("Waiver is a knowing and intentional relinquishment of a known right, whereas forfeiture 'results in the loss of a right regardless of the defendant's knowledge thereof and irrespective of whether the defendant intended to relinquish the right.'").

[51] App. to Opening Br. at A36 (Pre-Trial Conf. Trans. 35:3–10).

[52] Although not essential to my position, I also note that it would defy common sense to find that Trial Counsel allowed the redacted interview to be admitted as a strategic matter. Courts rarely second guess attorneys' strategic decisions but I find it difficult to believe that Trial Counsel could have been aware that the redacted interview falsely implied that his client shot a witness and Trial Counsel declined to object.

[53] *Bultron*, 897 A.2d at 764 ("Forfeiture, on the other hand, does not require the knowing and intentional relinquishment of a known right.").

[54] *Purnell*, 254 A.3d at 1101 (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).

16

*VI. The Trial Court's Admission of Andre Church's Redacted Interview Constituted Plain Error by Violating Burrell's Constitutional Right to a Fair Trial*

Under the plain error standard, the prejudice created by the redacted interview demands reversal because the error complained of was "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[55]  I apply the Ninth Circuit test described above to demonstrate why this error demands reversal.

*A. The Evidence Presented Was Actually False Because the Redacted Interview Is Reasonably Interpreted as Accusing Burrell of Shooting Church*

The most logical interpretation of the redacted interview is that Burrell shot Church. As redacted, the interview moves from "Trev did it," to "they," to "He shot me in my leg, then he came down slowly on top of me and shot me."[56]  Burrell is the consistent antagonist in Church's story and, because Burrell was the last individual mentioned before "he," the most logical interpretation of "he" is in reference to Burrell.

Further, this Court need not find that the interview's *most* reasonable interpretation is that Burrell shot Church – only that such an interpretation was reasonably likely for some jurors.[57]  Jurors are a diverse group of individuals and they do not always adopt the same or the most reasonable interpretations.  An interpretation that is reasonable but not the *most* reasonable, therefore, could be adopted by one or more jurors and prejudice them against

---

[55] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).

[56] App. to Opening Br. at A258–61 (Church Interview at 4:15–7:18).

[57] This aligns with the standard for a defendant to prevail in a false testimony case – "there is 'any reasonable likelihood that the false testimony *could* have affected the jury's verdict.'" Wayne R. LaFave et al., *Criminal Procedure*, 6 Crim. Proc. § 24.3(d) (4th ed. 2023) (quoting *United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985) (plurality op.)) (emphasis added by LaFave et al.).

17

Burrell. And because one juror can make the difference between a hung jury and a conviction, such an interpretation by a single juror could have made the difference between a hung jury and the conviction Burrell received.

The Majority maintains that the redactions were not confusing or misleading because none of the litigants expressed concerns during the trial. But even the State acknowledges this risk in its brief on appeal when it states that "[a]n equally reasonable interpretation of the flow of Church's commentary with the redaction is that Burrell shot Benson as a result of some dispute that started with Church's shooting, not that Burrell shot Church."[58] Taking the State at its word, therefore, suggests a juror hearing the interview would be as likely to accept the false interpretation as the true one. Thus, extrapolated across twelve jurors, I find it hard to be confident that not a single one was lured by the false implication.

### B. The State Knew or Should Have Known That the Evidence Was Actually False

The State argued before the trial court that the court should redact Church's naming of Thomas Payne as his shooter.[59] Therefore, the State knew that the implication from the

---

[58] Answering Br. at 31. Further, at oral argument, the State continued to acknowledge that the jury could have inferred that Burrell shot Church:

Q.   Why isn't it reasonable for a jury to infer that the "he" is Trev meaning Mr. Burrell?

A.   I do think it's a possibility that the jury could have interpreted it that way but I don't think that it was such a possibility that it created prejudice or any error in this case because you have the full context of the statement….

   Oral Argument Video at 28:08.

[59] App. to Opening Br. at A23 (Pre-Trial Conf. Trans. 22:3–23) (State arguing for redacting Thomas Payne's name from the Church interview).

18

redacted interview – that Burrell shot Church – was false.[60]  It was more difficult for the State to know that the interview gave this false implication, but this does not excuse the admission of the redacted interview.  "A convicted defendant is entitled to a new trial if he can establish that the Government intentionally or *inadvertently* failed to correct materially false testimony relevant to the credibility of a key Government witness at the trial[.]"[61]  Because the test only requires that the State should have known of the redacted interview's falsity, my conclusion does not require finding knowing intent on the part of the State; indeed, nothing in the record suggests the State knew of the false implication when it presented the redacted interview.

But courts have recognized that knowing intent by the State is unnecessary to satisfy the "should have known" standard.[62]  In *Commonwealth v. Ware*, the Supreme Judicial Court of Massachusetts held that a prosecutor who possessed transcripts of the defendant's previous interview, "should have known, based on these transcripts, that the defendant had not said at the second interview that he was picked up at or near the Dunkin' Donuts, and she should have corrected the trooper's testimony to the contrary."[63]  Consistent with the "should have known" standard, the court's holding did not require knowing intent from the prosecutor, noting that "[n]othing in the record definitively resolves whether the prosecutor

---

[60] *Id.*; *id.* at A261 (Church Interview. Trans. 7:7–8)) ("Thomas Pain [sic], that's who shot me."); *see also* Answering Br. at 23 ("At some point prior to Benson's shooting, Church was shot by Thomas Payne.").

[61] *United States v. Harris*, 498 F.2d 1164, 1168 (3d Cir. 1974) (emphasis added).

[62] *See Giglio v. United States*, 405 U.S. 150, 154 (1972) ("whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor.").

[63] *Commonwealth v. Ware*, 128 N.E.3d 29, 36 (Mass. 2019).

19

purposely elicited false testimony."[64]

This case is similar to *Ware*. As in *Ware*, nothing in the record suggests knowing intent on the part of the State. But the State should have known of the false implication because it possessed transcripts of Church's original interview and was an active participant in redacting the interview.[65] The redacted interview's logical flow links Burrell to the "He shot me in my leg" comment and the State acknowledges on appeal that the false implication that Burrell shot Church is "equally reasonable." Therefore, the State had the necessary transcripts in its possession and the inference of the false implication was reasonable to make. Accordingly, although nothing shows the State had knowing intent, the State should have known of the false implication because of the information it possessed and the reasonableness of the inference.

## C. The False Evidence Was Material

### 1. The False Implication from the Redacted Interview Devasted Burrell's Defense

The false implication was material because it dealt a devastating prejudicial blow to Burrell's defense. Jurors accepting the false implication that Burrell shot Church would be severely prejudiced against Burrell for two main reasons.

*First*, the implication that Burrell shot Church portrays Burrell as having a violent character and a propensity to commit similar gun crimes as the one for which he was on

---

[64] *Id.*

[65] App. to Opening Br. at A23 (Pre-Trial Conf. Trans. 22:3–23) (State arguing for redacting Thomas Payne's name from the Church interview); *id.* at A261 (Church Interview. Trans. 7:7–8) ("Thomas Pain [sic], that's who shot me.").

trial. Had Burrell actually shot Church, such an incident would need to find a non-propensity way to be admitted as Delaware law has recognized the unfair prejudice of a propensity inference.[66] Ironically, this implication being false helped it to bypass such scrutiny, but the invited propensity inference is the same: Burrell shot Church before, so he is the type of person who would have shot Benson. This is the sort of propensity inference that this Court has recognized invites jurors to convict based on acts not being tried.[67] In Rule 404 cases, courts generally attempt to limit the prejudicial impact of the propensity inference via a limiting instruction and, accordingly, courts generally require a limiting instruction.[68] This Court has noted that "[b]ecause such evidence is admitted for a limited purpose, the jury should be instructed concerning the purpose for its admission

---

[66] *Norwood v. State*, 95 A.3d 588, 597 n. 51 (Del. 2014) (first quoting *Huddleston v. United States*, 485 U.S. 681, 686 (1988)) ("... [E]vidence of similar acts has a grave potential for causing improper prejudice. For instance, the jury may choose to punish the defendant for the similar rather than the charged act, or the jury may infer that the defendant is an evil person inclined to violate the law.") (and then quoting 2 Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 10:44 (2013)) ("One of the primary justifications for excluding evidence of the defendant's misconduct is the danger of prejudice; the courts cautiously evaluate the probative value of the defendant's uncharged misconduct because the evidence may tempt the jury to convict on an improper basis. That danger is largely absent when the misconduct is a third party's misdeed.") (internal citations omitted).

[67] *See id.*

[68] *Cobb v. State*, 765 A.2d 1252, 1256 (Del. 2001) (quoting *Milligan v. State*, 761 A.2d 6, 10 (Del. 2000)) ("Limits on the jury's consideration of bad acts evidence must be 'explain[ed] in plain and direct language' and the instruction should 'specify clearly the limited purpose for which the uncharged misconduct could be considered.'"); *Milligan*, 761 A.2d at 9 (citing *Getz v. State*, 538 A.2d 726 (Del. 1988)) ("Because the 404(b) evidence can be admitted only for a limited purpose, *Getz* requires that the trial court limit the jury's consideration of the evidence to the explicit purpose for which the trial court admitted the uncharged misconduct."); *Smith v. State*, 669 A.2d 1, 5 (Del. 1995) ("If the trial court is satisfied that the evidence meets [the *Getz*] standards, it may be admitted, but the evidence should be the subject of a jury instruction explaining the limited purpose for which it was introduced.").

21

as required by D.R.E. 105."[69]  But here, there was no limiting instruction.  Therefore, even jurors scrupulously following the court's instructions may have convicted based on the false implication that Burrell shot Church.  This sort of unlimited propensity inference may lead to reversal when the prior bad act is true; allowing this unlimited inference to exist when it is indisputably false compounds the prejudicial impact and offends the right to a fair trial.

*Second*, the interpretation gives false credit to Church's testimony.  Burrell sought to undermine Church's credibility by alleging that Church was just naming names to escape from a harsh prison sentence.  By implying that Church told police that Burrell shot him rather than a third-party, it appears that Church named one fewer name than he did.  Further, the false implication that Burrell shot Church lends credibility to the State's argument that Church's reluctance to implicate Burrell at trial was due to Burrell's intimidation; rather than Burrell's position that Church only named names when he could get a deal for himself.

### 2. Context and Subsequent Actions Failed to Cure the False Implication That Burrell Shot Church

The Majority recognizes some potential confusion in the initial redacted interview but affirms by finding that context and subsequent actions cleared up this potential confusion.  I disagree.  The "He shot me in my leg" statement rang a highly prejudicial bell that context and subsequent actions failed to unring.

The Majority makes several arguments that context and subsequent actions

---

[69] *Getz*, 538 A.2d at 734 (citation omitted).

22

corrected the false implication of the redacted interview. However, I struggle to share the Majority's confidence as nothing following the "He shot me in my leg" statement necessarily contradicted the false implication that Burrell shot Church. Furthermore, all of these arguments rely on jurors making unstated inferences to disbelieve their initial impression that Burrell shot Church. Although it would be desirable for all jurors to put the puzzle together, I am not confident that the jurors did so when the much simpler conclusion – that Burrell shot Church – was readily apparent from the redacted interview.

### a. The Remainder of the Church Interview Does Not Contradict the False Implication and May Even Reinforce It

The Majority states that subsequent comments in Church's interview cleared up the false implication. The Majority points to subsequent portions of the interview where Church indicated that the gun from the Benson shooting was Church's gun and the existence of Church's "Never saw him again" comment which followed the "He shot me in my leg" comment. I find this unpersuasive to clear up the false implication for three reasons.

*First*, these portions do not necessarily contradict the false implication the Burrell shot Church. Had Burrell previously shot Church, Burrell could have taken Church's gun at the time; in fact, it would have been an ideal time to take it because a recently-shot Church would have been vulnerable to theft. Therefore, if anything, this comment tends to place Burrell at the scene of Church's shooting and shows Burrell was more likely to have shot Church. And the "Never seen him again" comment is ambiguous rather than contradictory. One interpretation – the factually correct one – is that Church has not seen

23

his shooter since Church was shot. But another reasonable interpretation is that Church has not seen his shooter since the day of the Benson shooting. Despite the latter interpretation being factually incorrect, the jury's attention was likely focused on the Benson shooting as it was the reason for the trial. And the State even appears to concede this ambiguity by noting that after the "Never seen him again" comment, an "equally reasonable" interpretation was that Burrell shot Church.[70] Thus, nothing in this interview requires jurors to disbelieve that Burrell shot Church.

*Second*, these portions require the jury to make an unstated inference counter to the direct statement that they just heard about Burrell shooting Church. Even assuming that the gun being the same in both shootings precludes Burrell from having previously shot Church, discrediting the false implication would require the jury to qualify a previous direct statement with an unstated inference. The "Never seen him again" comment suffers from the same issue as the jury would have needed to choose the correct meaning of an ambiguous comment.

*Third*, the subsequent portions of the redacted interview may further reinforce the false implication that Burrell shot Church. Shortly after the "He shot me in my leg" comment, Church describes Burrell saying "I should shoot you, too" to Church during the Benson shooting.[71] This allegation reinforces the false implication that Burrell shot Church by portraying Burrell as having not only a propensity to shoot people in general, but a

---

[70] Answering Br. at 31.

[71] App. to Opening Br. at A264 (Church Interview Trans. 10:2–3).

24

propensity to shoot Church in particular. Further, this comment was not accompanied by a limiting instruction even though cases where courts allow juries to hear of prior bad acts generally include a limiting instruction.[72] Thus, it is a very real possibility that the jury used this comment to make a propensity inference about other allegations against Burrell, including that Burrell shot Church.

### b. The Information Elicited on Cross-Examination Does Not Contradict the False Implication and Church's Questionable Credibility Makes Any Information Elicited From Him of Dubious Value

Courts have found that the harm of false evidence is not necessarily cured by defense counsel having the ability to cross-examine the witness giving false evidence. In *State v. Chao*, the Delaware Superior Court held that "while [the] defendant knew of the falsity of [the witness'] testimony, she was not in a position to effectively counter that false testimony[]" because she would have to take the risk of placing her credibility alongside that of the witness.[73] In *United States v. Freeman*, the Seventh Circuit held that even though the witness was "cross-examined extensively" the cross-examination did not cure the harm of the false testimony after its impact was weakened by an improper objection.[74] Further, "the failure of defense counsel to conduct an effective cross-examination, unless a deliberate trial tactic, cannot cure constitutional, prejudicial error committed by the prosecution. The fact that a more diligent counsel might have cured that error does not

---

[72] *Smith*, 669 A.2d at 5 ("If the trial court is satisfied that the evidence meets [the *Getz*] standards, it may be admitted, but the evidence should be the subject of a jury instruction explaining the limited purpose for which it was introduced.").

[73] *State v. Chao*, 1995 WL 412364, at \*5–6 (Del. Super. Ct. Feb. 17, 1995).

[74] *United States v. Freeman*, 650 F.3d 673, 681 (7th Cir. 2011).

negate it."[75]

Here, Trial Counsel failed to elicit information on cross-examination to clarify the false implication. Trial Counsel never elicited a denial that Burrell shot Church nor did Trial Counsel elicit any statements directly contradictory to the false implication. The Majority asserts that Trial Counsel's clarification that Church's shooting and Benson's shooting were separate incidents clarifies the false implication that Burrell shot Church. I cannot agree with this position. The false implication is that Burrell shot Church in a previous incident; therefore, Church testifying that he was shot in a previous incident is entirely consistent with the false implication. Similarly, the fact the Church was providing information on three separate shootings is entirely consistent with the false implication that Burrell shot Church in a previous shooting.

Further, Trial Counsel was in an impossible bind when it came to cross-examining

---

[75] *Imbler v. Craven*, 298 F. Supp. 795, 809 (C.D. Cal. 1969), *aff'd* 424 F.2d 631 (9th Cir. 1970); *see also Sivak v. Hardison*, 658 F.3d 898, 909 (9th Cir. 2011) (quoting *Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1122 (9th Cir. 2001)) ("It is 'irrelevant' whether the defense knew about the false testimony and failed to object or cross-examine the witness, because defendants 'c[an]not waive the freestanding ethical and constitutional obligation of the prosecutor as a representative of the government to protect the integrity of the court and the criminal justice system.'"), *quoted in Commonwealth v. Ware*, 128 N.E.3d 29, 37 (Mass. 2019). Some courts have found due process was not violated when defense counsel knew of the false testimony and failed to object. *See United States v. Harris*, 498 F.2d 1164, 1170 (3d Cir. 1974); *but see Harris*, 498 F.2d at 1172–73 (Seitz, C.J., dissenting sur denial of petitions for rehearing in banc):

> I do not see how defense counsel's failure to correct testimony known to the prosecutor to be false can waive defendants' right to a fair trial; and I find the conclusion of waiver here particularly baffling in light of the established rule that every reasonable presumption should be indulged against waiver of the right to a fair trial,

Regardless, Trial Counsel does not appear to have known of the false implication and the State did not argue so on appeal.

26

Church.  On the one hand, Trial Counsel would need to discredit Church's testimony regarding the Benson shooting since it directly implicated Burrell.  On the other hand, Trial Counsel would need to credit Church's testimony to convince the jury to believe any information clarifying that Burrell did not shoot Church.  To be effective, Trial Counsel's crediting of Church's testimony would have to be significant because a denial that Burrell shot Church would be contrary to the implication the jury just heard in the recorded interview.  Expecting Trial Counsel to have successfully pulled off this feat is demanding a sort of trial practice jujitsu that this Court cannot reasonably expect.

Here, the jury likely viewed Church's testimony with skepticism.  As discussed above, Trial Counsel had little choice but to discredit Church's testimony.  And Trial Counsel had a lot to discredit Church with.  Trial Counsel showed that Church had ample reason to lie to secure a deal for himself and that securing a deal was Church's key motivating factor.  Further, Church gave inconsistent and uncertain answers to other questions at trial and was saddled with a habitual offender background.  Thus, even if the information elicited from Church on cross-examination did contradict Burrell having previously shot Church, Church's wounded credibility makes it questionable that the jurors would have believed it.

Finally, even if Church's trial testimony contradicted the false implication that Burrell shot Church, the State's argument that Burrell was intimidating Church prevented the jury from believing it.  By arguing that Burrell was intimidating Church, the State implied that Church had reason to fear retribution if he spoke out against Burrell at trial.  Thus, the jury could have quite reasonably concluded that any of Church's equivocation at

27

trial about whether Burrell shot Church was done out of Church's own self-protection rather than out of a desire to truthfully testify.

### c. Trial Counsel's Closing Failed to Clarify the False Implication

Trial Counsel faced an uphill, if not impossible battle in clarifying the false implication in closing. And I believe that Trial Counsel failed to do so.

A case from the California appellate courts illustrates this difficulty. In *People v. Bullock*, the defendant's statement was redacted in a way that deleted words which could have lessened the culpability of his mental state. The court rejected the argument that defense counsel could have resolved the issue in closing "because the final statement was the only evidence that the jury heard about his mental state, in closing argument Bullock's counsel was limited solely to that statement in arguing that he did not have implied malice."[76] The court further noted that "[a]lthough attorneys have wide latitude in closing argument, they are generally restricted to discussing matters that are in evidence or subject to judicial notice."[77] Finally, the court noted that the redaction of the exculpatory statements "prevented his trial counsel from making an effective argument against the murder charge."[78]

Similar rules apply in Delaware courts meaning Trial Counsel faced similar difficulties in arguing for a position beyond the redacted interview. As redacted, the interview did not contain the name of Thomas Payne and Trial Counsel would have risked

---

[76] *People v. Bullock*, 2011 WL 5831556, at *8 (Cal. Ct. App. Nov. 21, 2011).

[77] *Id.*

[78] *Id.*

the ire of the court by mentioning it in closing. But even if Trial Counsel could have argued beyond the redacted interview, I believe that Trial Counsel was unsuccessful for three reasons.

*First*, it is questionable whether advocacy in a closing can convince jurors of something contrary to uncontradicted evidence. Jurors know that advocacy is not evidence and they should not credit it over evidence. The trial court instructed the jurors in this case as such,[79] meaning jurors following the court's instructions would be unwilling to ignore uncontradicted evidence in favor of defense closing advocacy. Thus, even if Trial Counsel could contradict the false implication from the interview, jurors following the court's instructions may be compelled to disregard Trial Counsel's argument.[80]

*Second*, even assuming jurors might credit closing advocacy over admitted evidence, Trial Counsel never directly contradicted the false implication that Burrell shot Church. Trial Counsel did not mention Thomas Payne by name and a trial court ruling prevented Trial Counsel from doing so. Nor did Trial Counsel ever directly tell the jury that anyone other than Burrell shot Church. Instead, the jury was left to put the puzzle together by itself. The Majority suggests that the false implication was cleared up by Church's testimony – mentioned again in closing – that the gun from the Benson shooting

---

[79] Trial Trans. at 144:22–145:7 ("While it's very important that you listen to and consider what the attorneys say during the trial, what they say is not evidence. Further, even though you must follow what I say about the law, what I say is not evidence. Evidence consists of testimony from the witnesses testifying from the witness stand and exhibits introduced through their testimony. It is this evidence only which you may consider in reaching your verdict.").

[80] *See United States v. Freeman*, 650 F.3d 673, 679 (7th Cir. 2011) (dismissing argument that prosecutor cleared up false testimony in closing argument and citing Seventh Circuit Pattern Instruction 1.06 which instructed that "the lawyers' statements to [the jury] are not evidence.").

was Church's gun. But as discussed above, an allegation that Burrell had the gun previously used to shoot Church is consistent with, if not supportive of the false implication. And even if it were not, the jury would have needed to qualify the direct statement that Burrell shot Church using an implied inconsistency.

*Third*, even if Trial Counsel's mention of the gun's identity weighed against the false implication, it was overshadowed by Trial Counsel repeating Church's allegation that Burrell said to Church "I should shoot you, too."[81] As was the case with cross-examining Church, Trial Counsel was in a bind here. Mentioning the allegation would support the idea that Burrell has a propensity to shoot people, specifically Church. But mentioning the allegation was necessary to demonstrate an inconsistency between the stories told by the State's leading witnesses – Church and Cabrera. Whether conscious of the dilemma or not, Trial Counsel opted for the latter path and repeated the "I should shoot you, too" allegation in closing.[82] Thus, Trial Counsel repeated an allegation in closing that would support the false implication, which could have reasonably left the jury with the impression that Burrell shot Church.

3. *The Weakness of the State's Other Evidence Suggests This Was a Close Case Where the Prejudice Could Have Its Greatest Impact*

Because this was a close case, I believe that the false implication may have been material to Burrell's conviction. This becomes clear after considering the State's evidence.

The State presented two purported eyewitnesses who claimed Burrell shot Benson

---

[81] App. to Answering Br. at B31 (Burrell Closing Argument at 119:23).
[82] *Id.*

30

– Edwin Cabrera and Andre Church – and neither of these witnesses was particularly credible. Cabrera's credibility was demolished when he testified that he made the statement "to help Andre Church and his situation[]" and that he "did not see Mr. Trevie Burrell shoot, [he] was told that's what happened."[83] Providing this favor to Church also fit with Cabrera's testimony that he had known Church for sixteen to seventeen years.[84] Regarding the interview, Cabrera testified that he only "somewhat" told the truth to Detective Kirlin.[85]

With Cabrera recanting his accusation of Burrell, the State was left with Church's interview and testimony. As previously noted, Church had a lot to gain by pointing the finger at Burrell. Church admitted during trial that, at the time of his interview, he had just been arrested on gun and drug charges and was "basically facing the rest of [his] life in prison."[86] Yet, after the interview, Church saw a judge, made bail, and went home.[87] He was later sentenced to twelve years as part of a plea agreement[88] but subsequently released after the State filed a substantial assistance motion following his testimony against an unrelated individual.[89]

Nor was Church's testimony particularly strong. Church could not recall whether

---

[83] App. to Opening Br. at A73 (Cabrera Trial Test. 189:4–12).

[84] *Id.* at A48 (Cabrera Trial Test. 164:12–13).

[85] *Id.* at A40 (Cabrera Trial Test. 156:13–16).

[86] *Id.* at A187–89 (Church Trial Test. 146:17–147:1, 147:18–148:1).

[87] *Id.* at A133 (Church Trial Test. 92:3–9, 92:13–93:12).

[88] *Id.*

[89] *Id.* at A187 (Church Trial Test. 146:5–16).

he told Detective Kirlin the truth in a previous interview[90] and, when questioned about the March 2019 interview, he gave a series of "I don't recall" responses.[91] And when asked about Benson's shooting at trial Church could not recall whether Cabrera was present, which house had the green awning, how many shots he heard, or how close the shooter was to Benson.[92]

Detective Kirlin also testified but, as she was not an eyewitness, she could not testify to personally seeing the Benson shooting. In addition to the 2019 Church interview that was redacted for the jury, Kirlin testified that she had interviewed Church in 2017 and Church had implicated Burrell in Benson's shooting.[93] However, Kirlin also testified that the interview was not recorded and the notes were instead written down after she returned to the police station.[94] Kirlin's police report of the 2017 interview also lacked any mention of Cabrera being present at the shooting and Kirlin later admitted that despite previously testifying that she believed Church had said Cabrera was present, this belief proved incorrect after reviewing the report.[95]

The State's physical evidence also fails to move this beyond a close case. This evidence consisted of the location of a shell casing and the snow brushed off a car, arguably

---

[90] *Id.* at A130 (Church Trial Test. 89:16–18).

[91] *Id.* at A131–32 (Church Trial Test. 90:11–91:17); *id.* at A143–44 (Church Trial Test. 102:14–103:2).

[92] *Id.* at A140–42 (Church Trial Test. 99:15–101:3).

[93] *Id.* at A145 (Kirlin Trial Test. 104:3–8); *id.* at A149–50 (Kirlin Trial Test. 108:18–109:9).

[94] *Id.* at A157 (Kirlin Trial Test. 116:15–19).

[95] *Id.* at A159–60 (Kirlin Trial Test. 118:22–119:10).

supporting Church and Cabrera being present.[96]  However, this is not physical evidence identifying Burrell as the shooter.  The State presented no physical evidence tying the gun to Burrell, nor any physical evidence placing Burrell at the scene.  Rather, this evidence merely aligns with the contention, but does not conclusively prove, that Church and Cabrera were at the scene.  Thus, even if the jury used this evidence to accept Church and Cabrera's presence, it does not follow that their identification of Burrell as the shooter in their unreliable testimony, became reliable.

Finally, even assuming the Nyala statements are admissible, they are not sufficient to convince me that Burrell would have been convicted regardless of the false implication that he shot Church.  The State urges this Court to view the Nyala statements as "akin to eyewitness testimony"[97] but I disagree with this conclusion.  Eyewitness testimony, though imperfect in its own way, comes from an individual who witnessed the events and provides testimony regarding them.  Further, that individual generally undergoes the crucible of cross-examination or, at the very least, has put their name and reputation on the line.  Here, no individual has testified that they witnessed Burrell make any communications as part of the alleged witness tampering conspiracy and there is no explicit link of the communications to Burrell.  No individual was willing to vouch for the credibility of the contention that Burrell made these communications and Nyala's assertion of his Fifth Amendment rights precluded any cross-examination.  The State is correct that the context

---

[96] *See* Trial Trans. 85:14–113:17 (State's Closing Argument).

[97] Answering Br. at 21.

of the calls tends to implicate Burrell, but suspicious context does not make the context "akin to eyewitness testimony."

By offering the Nyala statements, the State provided a piece of evidence that could have persuaded the jury to convict. But the fact that that jury could have been persuaded to convict is not that standard to affirm in cases where false evidence tainted the trial process. Here, the jury could have used the Nyala statements to convict, but they could have also seen the statements as insufficient because of the lack of an explicit link to Burrell and the possibility that the information was otherwise disseminated through the rumor mill of the prison community. Thus, the Nyala statements strengthen the State's position, but I do not believe that they eliminate the closeness of this case.

### A. The Devastating Prejudicial Impact of the False Implication and the Closeness of the Case Show Burrell Has Satisfied Plain Error

I am satisfied that the redacted interview's false implication that Burrell shot Church was a material defect so clearly prejudicial to Burrell's substantive rights that presenting it to the jury constituted a manifest injustice. Few things could be more devastating to a criminal defendant on trial for shooting a person than falsely implying that the defendant shot another person. This Court has recognized the danger that propensity inferences may lead jurors to convict based on acts not before the trial court.[98] The manifest injustice of

---

[98] *Norwood v. State*, 95 A.3d 588, 597 n. 51 (Del. 2014) (quoting *Huddleston v. United States*, 485 U.S. 681, 686 (1988)) ("... [E]vidence of similar acts has a grave potential for causing improper prejudice. For instance, the jury may choose to punish the defendant for the similar rather than the charged act, or the jury may infer that the defendant is an evil person inclined to violate the law.") (quoting 2 Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 10:44 (2013)) ("One of the primary justifications for excluding evidence of the defendant's misconduct is the danger of prejudice; the courts cautiously evaluate the probative value of the defendant's uncharged

34

such a propensity-based conviction is magnified when there is no propensity limiting instruction and the act supporting the propensity inference never occurred.

A defendant may prevail on a false evidence claim when there is any reasonable likelihood that the false evidence could have affected the jury's verdict.[99] With a set of flawed eyewitnesses and weak physical evidence, this is the sort of close case where prejudicial information may have the greatest likelihood of affecting the verdict. Here, the false implication that Burrell shot Church severely prejudiced Burrell in two ways. *First*, it enabled the jury to draw a propensity inference that Burrell was once a shooter, always a shooter. And *second*, it gave false credit to the State's argument that Church's reluctance to implicate Burrell at trial was due to Burrell's intimidation. Either of these would be devastatingly prejudicial on their own; combined they are the sort of prejudicial information with the greatest likelihood of changing a close case's outcome. Because of this, I believe that the defect in admitting the redacted interview is so clearly prejudicial to Burrell's substantive rights that admitting it constituted a manifest injustice. Accordingly, I believe that plain error exists and that this case should be reversed and remanded for a new trial. I respectfully dissent.

---

misconduct because the evidence may tempt the jury to convict on an improper basis. That danger is largely absent when the misconduct is a third party's misdeed.") (internal citations omitted).

[99] Wayne R. LaFave et al., *Criminal Procedure*, 6 Crim. Proc. § 24.3(d) (4th ed. 2023).